**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-60732
Summary Calendar
_____


JOSEPH J. GAJDA and LILLIAN A. GAJDA,

Petitioners-Appellants,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.


_____

Appeal from a Decision of
the United States Tax Court
_____

August 7, 1998

Before JONES, SMITH, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Joseph Gajda, who files tax returns jointly with his wife Lillian Gajda, appeals the Tax Court's summary judgment on Joseph's claim that $91,690 of income received upon his resignation from employment constituted payment on account of sickness or personal injury excludable under section 104(a)(2) of the Internal Revenue Code. Because the pleadings demonstrate that the employer offered

the payment in lieu of damages and not to settle a claim for personal injury, we affirm.

## A.

Gajda was an engineer employed with International Business Machines Corp. ("IBM") for thirty-two years. At some point in 1993, he became eligible to participate in IBM's Modified and Extended Individual Transition Option Program ("ITO II"), which had been implemented as part of IBM's effort to reduce the size of its workforce and was offered to all employees who met certain age and job category requirements.

Under the voluntary program, employees could choose to accept a lump-sum payment in return for their voluntary resignation and release of all potential claims against IBM arising out of their employment or its termination. The agreement provided, in relevant part, that Gajda agreed

> to release International Business Machines corporation (hereinafter, IBM), from all claims, demands, actions or liabilities you may have against IBM of whatever kind, including but not limited to those which are related to your employment with IBM or the termination of that employment. You agree this also releases from liability IBM's agents, directors, officers, employees, representatives, successors and assigns (hereinafter "those associated with IBM"). You agree that you have executed this release on your own behalf, and also on behalf of any heirs, agents, representatives, successors and assigns that you may have now or in the future. You also agree that this release covers but is not limited to claims arising from the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, and any other federal or state law dealing with discrimination in employment on the

2

basis of sex, race, national origin, religion, disability or age. You also agree that this release includes claims based on theories of contract or tort, whether based on common law or otherwise.

...

1. The benefits provided pursuant to the ITO Program constitute consideration for this release, in that these are benefits to which you would not have been entitled had you not signed the release.

...

3. This release does not waive any claims which you may have that arise after the date you sign this release.

...

6. In the event of a rehire by IBM or any of its subsidiaries as a regular employee, you understand that IBM reserves the right to require repayment of a prorated portion of the ITO II Program payment. The amount of the repayment will be based on the number of weeks off the IBM payroll compared with the number of weeks salary used to calculate your payment.

Gajda claims that he was pressured into resigning, but he did not complain of this or of anything else to company officers, despite a clause in the contract suggesting that employees consider the offer carefully, consult with their attorneys, and discuss any tort claims with the company.[1]  He signed the release in 1993,

---

[1] The relevant portion of the release agreement read as follows:

> IBM ADVISES YOU TO CONSULT AN ATTORNEY BEFORE YOU SIGN THIS RELEASE
>
> If you feel that you are being coerced to sign this release or that your signing would for any reason not be voluntary, or you believe the process by which you have been offered this release or the payment in exchange for this release is discriminatory, you are encouraged to discuss this with your

(continued...)

3

apparently without doing any of these things, although he was given at least forty-five days to consider the offer. He received a lump sum special incentive payment of $91,690 calculated, like other ITO II payments, on the basis of his years of service and rate of pay. IBM withheld federal income, social security, and Medicare taxes. After these events occurred, Gajda fell into a deep depression and sought treatment from three doctors.

When he filed his 1993 income tax return, Gajda excluded the special incentive payment from gross income. He claimed on a Form 8275, "Disclosure Statement," that the income was a payment for "age discrimination and other potential tort claims" excludable from income under 26 U.S.C. § 104(a)(2) as a payment on account of sickness or personal injury. The Commissioner assessed a deficiency of $33,343.

Gajda joined a suit with seventeen other taxpayers who had received early retirement payments from IBM. Because most of those taxpayers, unlike Gajda, had suffered nothing that might be interpreted as "personal injury" for which they might have had a claim against IBM, the Tax Court severed Gajda's case.

_____

(...continued)
> management or Personnel before signing this release. After reviewing the release with your attorney, you can discuss concerns you have with your manager or your attorney can contact legal counsel at your location. You should thoroughly review and understand the effects of the release before signing it.

A footnote accompanying this paragraph described the potential discrimination claims an employee might have, including claims under the ADEA and state and local law.

The Tax Court granted summary judgment in favor of the Commissioner, noting that the intent of the employer would determine the treatment of the payment. *See Knuckles v. Commissioner*, 349 F.2d 610, 612 (10th Cir. 1965). It found that the payment was in the nature of severance pay rather than of compensation for personal injury, because Gajda had not asserted any claim at the time he signed the release, because the release was a standard document offered to all employees, because the amount of the payment was calculated based on Gajda's salary and number of years of service, and because the agreement required repayment of a *pro rata* portion of the incentive payment depending on the employee's length of time between the resignation and the rehire. Finally, the Tax Court noted that the release makes no attempt to allocate the payment between severance pay and personal injuries, and that Gajda had offered no facts upon which an allocation could be based.

B.

Summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." TAX COURT RULES OF PRACTICE AND PROCEDURE 121(b). The moving party bears the burden of proving that there is

5

no genuine issue of material fact, and factual inferences are viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The opposing party cannot rest upon mere allegations or denials, but must set forth specific facts showing there is a genuine issue for trial. TAX COURT RULES OF PRACTICE AND PROCEDURE 121(d).

Gajda argues that IBM's intent is a question of fact and that the aspects of the agreement noted by the Tax Court do not prove that IBM intended these payments solely as severance pay. Gajda does not meet his burden of providing specific facts showing there is a genuine issue of fact for trial, however.

Gajda is correct that the factors considered by the Tax Court do not conclusively demonstrate that IBM intended the payment as severance pay in the face of evidence to the contrary. For such evidence to the contrary, however, Gajda provides only the irrelevant evidence of his subsequent depression and his unsubstantiated allegations that IBM forced him to sign the agreement. These allegations do not contradict the obvious conclusion from the language of the agreement, the nature of the program, and the calculation of the payment itself, that IBM intended the payment as compensation of wages lost upon early retirement and not to settle personal injury claims.

Gajda's case presents no novel issues. In *Webb v. Commissioner*, 71 T.C.M. (CCH) 2004 (1996), the Tax Court considered

6

almost identical facts:  A taxpayer who retired early under the IBM ITO program, suffered mental anguish after the resignation, and then claimed for the first time that he signed the release under protest.  The Tax Court characterized the payment as severance, noting that under the taxpayer's description of the facts, "the Release itself was the cause of the injury."  *Id.*  The Tax Court also cited the same factors it considered in the instant case.

Gajda's claim suffers the same defects.  Like the plaintiff in *Webb*, Gajda essentially argues that he has an ADEA or emotional distress claim based on the fact that IBM forced him to resign and sign the release.[2]  Because the wrongful act leading to his subsequent depression did not occur prior to the signing of the release, the simultaneous special incentive payment could not have been made to resolve an existing claim for personal injury.

Under Gajda's argument, the mere fact that IBM foresaw lawsuits arising out of the ITO II program meant that the payment was in part a settlement of those potential future claims.  This argument is contradicted by *Taggi v. United States*, 35 F.3d 93, 96–97 (2d Cir. 1994).

In *Taggi*, the taxpayer took early retirement under an AT&T program that offered two incentive payment options.  Under one, the

---

[2] Damages under the ADEA are not excludable under § 104(a)(2) because they compensate lost wages and impose punitive damages, but do not contain an emotional distress or other personal injury component. *Commissioner v. Schleier*, 515 U.S. 323, 326 (1995).  Accordingly, Gajda's payment could only be excluded to the extent it settled a potential state-law emotional distress claim.

7

taxpayer would have received three percent of his base pay multiplied by the number of years he had worked at AT&T. Under the second, he would receive five percent. To receive the higher payment, he had to sign a Separation Agreement and Release, which claimed to be a "full legal release." *Id*. at 94. After he resigned, he attempted to bring a claim under the ADEA. When this claim was dismissed because of the Separation Agreement, the taxpayer made a refund claim asking that the incentive payment be treated as a payment for personal injury under § 104(a)(2).

Although Taggi's claim was much stronger than Gajda's, the court denied § 104(a)(2) treatment. *Id*. at 96-97. It cited 26 C.F.R. § 1.104-1(c), which provides that damages received on account of personal injuries or sickness are those received "through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." The court noted that exclusions from income are to be defined narrowly and that parties must be prohibited from creating contrived "settlement agreements" to avoid taxation of the proceeds. In order to prevent such contrived settlements, the courts must require the presence of an actual dispute. If § 104(a)(2) were construed to encompass releases of potential unspecified future claims, as Gajda recommends, manufacturing § 104(a)(2) tax treatment would be simple.

While the parameters for § 104(a)(2) treatment remain somewhat

undefined, Gajda's case obviously does not fit within them. Because Gajda has alleged no facts to contradict IBM's obvious intent to provide severance pay, the decision of the Tax Court is AFFIRMED.