Reidar ABRAHAMSEN and Malfrid Abrahamsen, et al., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–787T.

United States Court of Federal Claims.

July 9, 1999.

Neil D. Kimmelfield and James T. McDermott, Portland, OR, for plaintiff.

Elizabeth D. Seward, U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Loretta C. Argrett and Chief, Court of Federal Claims Section, Mildred L. Seidman, for defendant.

## OPINION

FIRESTONE, Judge.

The question the court addresses on cross-motions for summary judgment is whether downsizing payments received by four former IBM employees upon signing a general release are subject to federal income and employment taxes as income and wages or are tax exempt as payments for tort-type injuries.

## PROCEDURAL BACKGROUND

The instant case was brought by 2,631 former IBM employees, each of whom participated in one of four IBM downsizing programs from 1991 to 1995. They are now each claiming a refund of the federal income and Federal Insurance Contribution Act ("FICA")[1] taxes IBM withheld from their downsizing payment. By Orders filed July 29, 1997, August 21, 1997, and September 2, 1997, the court designated four test-case plaintiffs, who are representative of the different types of IBM downsizing programs. The parties agreed to suspend the remaining 2,627 cases pending a final decision, including any appeal, of the issues that are the subject of this summary judgment.

## FACTUAL BACKGROUND [2]

From 1988 through 1996, IBM designed and implemented a number of "downsizing"

---

1. 26 U.S.C. §§ 3101–3128 (1994 & Supp.1999).

2. The following facts are taken from the parties' Joint Stipulation of Facts and the facts asserted in the parties' summary judgment briefs. As discussed, *infra,* while certain inferences to be drawn from the facts are in dispute, none of these inferences are material to the ultimate outcome of this case.

programs in an effort to reduce its workforce throughout the world, including the United States. Through IBM's downsizing programs in the United States, more than 60,000 employees resigned, retired, or took a leave of absence prior to retirement. Each of the four test-case plaintiffs, Douglas R. Willoughby, Suzanne M. Hill, Nathan J. Marciano, and Barbara C. Jordan, was an at-will IBM employee who left the company pursuant to one of IBM's downsizing programs.

From 1991 through 1995, IBM instituted voluntary, involuntary, and hybrid downsizing programs. Under each of IBM's downsizing programs, employees were offered lump-sum cash payments based on their salary and years in service in exchange for signing a General Release and Covenant Not to Sue (the "release"). The release language for each program was substantially similar in form and substance and provided as follows:

*In exchange for the sums and benefits which you will receive pursuant to the terms of the [program] [you] agree to release [IBM] from all claims, demands, actions or liabilities you may have against IBM of whatever kind, including but not limited to those which are related to your employment with IBM or the termination of that employment.*[3] You agree that this also releases from liability IBM's agents, directors, officers, employees, representatives, successors and assigns (hereinafter "those associated with IBM").... You also agree that this release covers, but is not limited to, claims arising from the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Acts of 1964, as amended, and any other federal or state law dealing with discrimination in employment on the basis of sex, race, national origin, religion, disability, or age. *You also agree that this release includes claims based on theories of contract or tort, whether based on common law or otherwise.... IBM will with-*

*hold from your [program] payment the appropriate payroll taxes*[4].... *In the event of rehire by IBM or any of its subsidiaries as a regular employee, you understand that IBM reserves the right to require repayment of a prorated portion of the [program] payment.* (emphasis added)

Under the terms of the voluntary programs, departing employees received one week's salary for each six months of service, fully or partially completed, up to a maximum of fifty-two weeks of pay. Employees departing under the involuntary program received a week's salary for each six months of service up to a maximum of twenty-six weeks of salary. IBM did not negotiate the amount of the payment any program participant received. Similarly, IBM did not negotiate its standardized release form with program participants. Finally, IBM did not allocate any portion of its program payments to the settlement of any tort or tort-type claims for personal injury or sickness. Indeed, each participant was informed, either through the release or through the program documents, that their payment would be subject to withholding of appropriate federal taxes. Each employee also was informed that if they were to return to IBM they would have to return a prorated portion of their payment. It is against this backdrop that the facts concerning each of the four test case plaintiffs will be examined.

## A. Douglas R. Willoughby

Mr. Willoughby began his employment with IBM in June 1959. From September 1984 to February 1991, Mr. Willoughby worked as an Advisory Engineer in IBM's Poughkeepsie, New York laboratory. On March 28, 1991, IBM announced the Voluntary Transition Payment Program ("VTP") and, soon thereafter, distributed the VTP Employee Information Package to all employees at Mr. Willoughby's site. Although

---

3. The Voluntary Transition Payment Program's ("VTP") release waived claims pertaining only to the program participant's employment with IBM or termination of that employment.

4. ɔugh the releases associated with the VTP ɹe ITO II Pre-Retirement Leave of Absence ᵖ ⁻ˑms contained this notification that IBM

would withhold appropriate taxes, the Mid–Hudson Valley Transition Program ("MHVTP") and the Resource Restructuring Transition Plan ("RRTP") did not. However, both the MHVTP and the RRTP employee information packages provided the withholding notification.

Mr. Willoughby had considered retiring as early as 1986 and 1987 under previous IBM downsizing programs, he declined to leave at that time for financial reasons. By 1991, however, Mr. Willoughby's workload had increased while his job satisfaction had decreased. After reviewing the VTP Employee Information Package, Mr. Willoughby believed his future with IBM was at best uncertain. On May 31, 1991, he applied for the "voluntary transition payment" and indicated to IBM that he would retire if his application were approved. Mr. Willoughby's receipt of his VTP payment was contingent upon his retiring by December 31, 1991, and upon his signing IBM's General Release and Covenant Not to Sue.[5] Mr. Willoughby signed the release and received a lump-sum payment of $67,148.

For the purposes of this litigation Mr. Willoughby stipulated that prior to signing the general release and covenant not to sue he had not experienced any symptoms of personal injury, including any physical or emotional harm; had not asserted or threatened any claim against IBM for personal injury, including any physical or emotional harm; and had not communicated with IBM regarding any personal injuries or claims for personal injury, including any physical or emotional harm.

IBM issued a W–2 to Mr. Willoughby for 1991 showing wages of $140,038.13, which included the $67,148 lump sum payment. On March 21, 1995, Mr. Willoughby filed claims for return of income and employment taxes of $20,533 and $775.59, respectively, asserting that IBM paid the $67,148 "in settlement of tort and tort type claims," including claims under the Age Discrimination in Employment Act of 1967, and thus the payment was excludable from taxation under 26 U.S.C. § 104(a)(2).[6] He also argued that the payment was not 'wages' subject to FICA taxes because it did not constitute remuneration for employment. The Internal Revenue Service ("IRS") disallowed Mr. Willoughby's claims, and this suit timely followed.

## B. Suzanne M. Hill

Ms. Hill joined IBM in 1966 and worked for more than twenty-three years as a marketing support representative. Ms. Hill participated in the ITO II Pre–Retirement Leave of Absence Program ("ITO II"). When she applied for the program, Ms. Hill had been under considerable stress. Her performance evaluation had been lowered from a "2" to a "3," and she feared being put on notice for unsatisfactory performance. IBM accepted Ms. Hill into the ITO II program, and on July 31, 1992, she executed the required release[7] and received a lump-sum payment of $74,904.

For the purposes of this litigation Ms. Hill stipulated that prior to signing the general release and covenant not to sue she had not experienced any symptoms of personal injury, including any physical or emotional harm, had not asserted or threatened any claim against IBM for tort-type personal injury or sickness, and had not communicated with IBM regarding any such claims.

IBM issued Ms. Hill a form W–2 for 1992 showing wages of $113,327.24, which included the $74,904 lump sum payment. On her 1992 tax return Ms. Hill reported the $74,904 payment. On July 25, 1994, Ms. Hill filed an amended tax return on which she claimed a refund of income taxes of $22,433. Ms. Hill maintained that the payment was excludable

---

5. Mr. Willoughby's release was substantially similar in form and substance to the release language as reprinted, *supra*, in the statement of facts.

6. At the time each of the plaintiffs filed their return, section 104(a)(2) provided in pertinent part that "damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness" are exempt from federal income tax. 26 U.S.C. § 104(a)(2). Treasury Regulation 1.104–1(c) defines "damages received" as "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Treas. Reg. § 1.104–1(c) (as amended in 1970). Such payments also are excluded from FICA on the grounds that they are not "wages" under 26 U.S.C. § 3101 ("remuneration for employment").

7. Ms. Hill's release mirrored the release language as reprinted, *supra*, in the statement of facts.

under section 104(a)(2) because it was received "in exchange for the release and/or settlement of tort type rights as part of the former employer's [downsizing] program." On June 26, 1995, Ms. Hill filed a claim for refund of Social Security taxes of $1,960.23, asserting substantially the same grounds as Mr. Willoughby. By letter dated August 21, 1995, the IRS disallowed her claims. Thereafter, Ms. Hill timely filed this suit.

### C. Mr. Nathan Marciano

Mr. Marciano joined IBM in 1965 and worked for nearly twenty-eight years in various technical support positions. Mr. Marciano participated in the Mid–Hudson Valley Transition Program ("MHVTP") program. Mr. Marciano's application to the program on March 22, 1993, was due in part to his transfer to a different department, which was followed by a drop in his employee appraisal rating and an undesirable work assignment. IBM accepted Mr. Marciano's MHVTP application, and upon executing the required release,[8] Mr. Marciano received a lump-sum payment of $56,744. For the purposes of this litigation Mr. Marciano also has stipulated that he never asserted or threatened a tort-type claim against IBM for personal injury or sickness. He further stipulated that he never communicated with IBM regarding any such claims.

IBM issued a W–2 to Mr. Marciano for 1993 showing wages of $83,409.41, which included the $56,744 lump sum payment. On his 1993 tax return Mr. Marciano included the $56,744 in wages. On May 11, 1995, Mr. Marciano filed an amended tax return, claiming a refund on income tax of $14,535. Mr. Marciano maintained that the payment was excludable under section 104(a)(2) because it was received "in settlement of his claims based on tort and tort type rights, including rights under the Age Discrimination in Employment Act of 1967." On the same date Mr. Marciano filed a claim for refund of Social Security taxes of $2,741.00, asserting the same grounds as Mr. Willoughby and Ms. Hill. On July 31, 1995, the IRS disallowed

Mr. Marciano's claims, and this suit timely followed.

### D. Ms. Barbara C. Jordan

Ms. Jordan joined IBM in 1984 and worked for approximately ten years as an advisory marketing representative. On January 27, 1994, Ms. Jordan's manager gave her the Resource Restructuring Transition Plan ("RRTP") summary description and notified her that she had been designated "surplus" and was to be laid off permanently effective March 31, 1994. Immediately afterwards, IBM placed her on administrative leave in order for her to find a new job or another job at IBM. Ms. Jordan was unsuccessful in finding a new job. Although Ms. Jordan consulted with more than one attorney regarding possible discrimination claims she believed she had against IBM, Ms. Jordan never filed a claim but instead decided to take the payment IBM offered under the RRTP program. On March 31, 1994, Ms. Jordan signed the release and covenant not to sue[9] and received a $27,355.55 payment.

Ms. Jordan has entered into the same stipulations as the other test-case plaintiffs. She agrees that she never experienced any symptoms of personal injury, including any physical or emotional harm, never asserted or threatened a claim for tort-type injuries, and never communicated with IBM about any tort-type claims.

IBM issued a W–2 to Ms. Jordan for 1994 showing wages of $44,896.44, which included the $25,355.55 lump sum payment. Ms. Jordan included the $27,335.55 in wages on her 1995 tax return. On July 18, 1995, Ms. Jordan filed an amended tax return, claiming a refund of income taxes of $11,764. As grounds for her claim, Ms. Jordan maintained that the payment was excludable under section 104(a)(2) because it was received "in settlement of taxpayer's claims based on tort or tort type rights, including rights under the Age Discrimination in Employment Act of 1967." On the same date she filed a

---

**8.** Mr. Marciano's release was substantially similar in form and substance to the release language as reprinted, *supra,* in the statement of facts.

**9.** Ms. Jordan's release was substantially similar in form and substance to the release language as reprinted, *supra,* in the statement of facts.

claim for refund of Social Security taxes of $2,001.68, asserting the same grounds as the other test-case plaintiffs. On August 5, 1995, the IRS disallowed Ms. Jordan's claims, and this suit timely followed.

### E. The Basic Purpose of IBM's Downsizing Payments

Despite their agreement on the above-noted facts, the parties are not in agreement over IBM's basic purpose in making the payments to former employees under its various downsizing programs. Over defendant's objection, plaintiffs have filed the Declarations of Richard J. Reibstein and Frank Berte.[10] Mr. Reibstein, an attorney specializing in labor and employment law, asserted that based on his examination of IBM downsizing program documents, deposition testimony, and other documents, IBM reasonably should have concluded that (1) of the entire risk of liability to which IBM was exposed from employees participating in the voluntary downsizing program, approximately 95% of the risk was attributable to tort claims, and (2) of the entire risk of liability to which it was exposed from employees participating in the involuntary downsizing programs, approximately 85% of the risk was attributable to tort claims. Plaintiffs also offer Mr. Berte's statement. Mr. Berte is a former IBM employee who left IBM under a downsizing program and subsequently worked for a recruiting firm where he attempted to place former IBM employees in new jobs after they left IBM under its downsizing programs. Plaintiffs offer his statement to prove that former IBM employees were stigmatized and defamed by the downsizing process. Plaintiffs contend, based on Mr. Berte's statement together with the undisputed evidence listed below, that the exchange of money for a release makes the payments tax-exempt tort settlement payments. The undisputed evidence plaintiffs

rely on to support their contention may be summarized as follows:

1. IBM only made lump sum payments to employees who agreed to sign releases;

2. IBM intended each release to cover that employee's potential claims;

3. IBM had serious and realistic concerns about the threat of lawsuits that could be brought, including concerns about arguably tortious acts, and the emotional suffering caused by downsizing;

4. IBM considered every employee a potential litigant;

5. IBM employees were told that their payments were "in exchange" for their releases;

6. The program documents expressly referred to the lump sum payments as "monetary settlements" or "settlements;" and

7. Because IBM employees were "at will" employees, IBM did not need to induce plaintiffs to leave.

Finally, plaintiffs contend, based on inferences drawn from Mr. Reibstein's expert opinion, that 95% of the payments IBM made under its voluntary programs should be allocated to tort damages, and 85% of the payments IBM made under its involuntary program should be allocated to tort damages.

Defendant disagrees with plaintiffs' characterization of the evidence and contends that IBM's basic purpose in offering payments to departing employees was to encourage employees participating in the voluntary downsizing programs to leave and to ease all employees in their transition away from IBM. Defendant contends, therefore, that the basic purpose of the payments was not to obtain "releases," but to provide severance. In addition, to show that the payments were not tort settlement payments, defendant points to the following undisputed evidence:

---

10. Although defendant initially moved to strike Mr. Berte's statement on the grounds that he was not timely identified and has since died, defendant waived the objection to Mr. Berte's statement at oral argument. Defendant also has moved to strike Mr. Reibstein's statement on the grounds that Mr. Reibstein's opinion regarding allocation of the IBM downsizing payments is not relevant because IBM did not, in fact, allocate any portion of its payments to these plaintiffs for tort claims, and the opinion testimony is not based on any direct evidence of IBM's intent in making a payment to these plaintiffs. Defendant's motion in regard to Mr. Reibstein is dealt with, *infra,* at footnote 18.

1. The payments to plaintiffs were not individually negotiated or tied to any individual tort claims but were based on years in service and amount of salary;

2. IBM did not calculate the payment formula based upon potential tort litigation risks;

3. IBM made the payments based on the same formula it had applied before it asked for a release;

4. The release each plaintiff signed was general, was not individually negotiated, and did not identify any specific tort claims;

5. IBM was not aware of any tort claims for personal injury or sickness by these plaintiffs;

6. The plaintiffs each stipulated that they had not suffered any symptoms of physical or emotional injury before signing the release; and

7. IBM required employees to agree to return a prorated portion of the payment if they returned to IBM.

Based on these facts, defendant argues that the payments to these individual plaintiffs were severance payments and thus taxable.

### F. Proceedings Below

Following extensive discovery, defendant moved for summary judgment on May 22, 1998. Plaintiffs filed a cross-motion for summary judgment on August 7, 1998. Briefing was concluded in June 1999. Oral argument was heard on June 10, 1999.

### DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). When the parties have filed cross-motions for summary judgment, the court must evaluate each motion on its own merits. *See Thermocor, Inc. v. United States*, 35 Fed.Cl. 480, 485 (1996) (citing

*Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988)). "The fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of material fact for trial does not relieve the court of its duty to decide whether summary judgment is appropriate." *Id.* In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505.

A complete analysis of the facts and law leads the court to conclude that, despite the parties' disagreement over the basic purpose for IBM's payment, the case is appropriate for summary judgment. Summary judgment is appropriate against a party who fails to adduce facts sufficient to establish the existence of an element essential to that party's case and for which they would bear the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Here, taking all of plaintiffs' factual assertions as true, as well as all reasonable inferences from those facts in plaintiffs' favor, plaintiffs have not adduced facts sufficient to meet certain key elements of their tax exclusion claims. In such circumstances, summary judgment must be granted for the United States.

### II. IBM's Payments to the Four Test-Case Plaintiffs Are Not Excludable from Income Under Section 104(a)(2).

██ The analysis of plaintiffs' claims must begin with 26 U.S.C. § 61(a), which states that except as otherwise provided "gross income means all income from whatever source derived." It is well established that "income" under section 61(a) is to be given its broadest meaning and that exclusions from income are disfavored. *See Commissioner v. Schleier*, 515 U.S. 323, 327–28,

115 S.Ct. 2159, 132 L.Ed.2d 294 (1995); *United States v. Burke*, 504 U.S. 229, 233, 248, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992); *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949). "A taxpayer claiming an exclusion from income bears the burden of proving that his claim falls within an exclusionary provision of the Code." *Taggi v. United States*, 35 F.3d 93, 95–96 (2d Cir.1994). Here, plaintiffs claim that their payments are excludable from income pursuant to 26 U.S.C. § 104(a)(2).

Section 104(a)(2) excludes from income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." [11] 26 U.S.C. § 104(a)(2). Treasury Regulation 1.104–1(c) defines the term "damages received" as "an amount received ... through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Treas. Reg. § 1.104–1(c) (as amended in 1970).

Plaintiffs concede that none of the four test-case plaintiffs prosecuted a legal suit or action based upon tort or tort-type rights. Thus, in order to qualify for exclusion under section 104(a)(2), plaintiffs must demonstrate the existence of a "settlement agreement" entered into "in lieu of such prosecution." In this connection, plaintiffs agree that "where the issue is an asserted exclusion from taxable income, it is imperative that a 'settlement agreement' involve a bona fide dispute" over excludable damages. *Taggi*, 35 F.3d at 95; *accord Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999); *Gajda v. C.I.R.*, 158 F.3d 802, 805 (5th Cir.1998); *Lubart v. Commissioner*, 154 F.3d 539, 542 (5th Cir. 1998).

■ In addition, the parties agree that plaintiffs also must meet two more requirements under section 104(a)(2) as set forth in *Commissioner v. Schleier*, 515 U.S. 323, 337, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995).[12] In *Schleier* the Supreme Court explained that in order for payments to be excludable under section 104(a)(2), "the taxpayer must [first] demonstrate that the underlying cause of action giving rise to the recovery is *'based upon tort or tort type rights'*; and second, the taxpayer must show that the damages were received *'on account of personal injuries or sickness.'*" *Id.* (emphasis added).

■ Tested against these agreed-upon standards, defendant argues that the four test-case plaintiffs in this case are no different from the plaintiffs in fifteen previous cases whose IBM downsizing payments have been found to be subject to federal income taxation.[13] As a threshold matter, defendant

---

11. In 1996 section 104(a)(2) was amended specifically to provide that "punitive damages" are not excludable from income under section 104(a)(2) and to change "personal injuries and sickness" to "personal physical injuries or physical sickness." Small Business Job Protection Act of 1996, Pub.L. No. 104–188, § 1605, 110 Stat. 1755, 1838.

12. In *Schleier* the Supreme Court held that recovery under the Age Discrimination in Employment Act of 1967 is not excludable from gross income under section 104(a)(2). In doing so the court laid out the tests to be applied in determining whether payments are excludable under section 104(a)(2). The Court's decision in *Schleier* followed a 1992 Supreme Court case holding that a payment received in settlement of a backpay claim under the pre–1991 version of Title VII of the Civil Rights Act of 1964 was not excludable from gross income under section 104(a)(2). *See United States v. Burke*, 504 U.S. 229, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992).

13. The cases, all decided without trial, are: *Gajda v. Commissioner*, 158 F.3d 802 (5th Cir.1998),

*aff'g* 74 T.C.M. (CCH) 228 (1997); *Lubart v. Commissioner*, 154 F.3d 539 (5th Cir.1998), *aff'g* 74 T.C.M. (CCH) 223 (1997); *Cook v. United States*, No. 97–829T (Fed.Cl. June 21, 1999); *Aschkenasy v. Internal Revenue Serv.*, No. 96 CIV. 1932, 1998 WL 438829 (S.D.N.Y. July 27, 1998); *Adams v. Commissioner*, 74 T.C.M. (CCH) 277, 1997 WL 433796 (1997); *Brennan v. Commissioner*, 74 T.C.M. (CCH) 69, 1997 WL 375582 (1997); *Carey v. Commissioner*, 74 T.C.M. (CCH) 705, 1997 WL 588909 (1997); *Hamm v. Commissioner*, 74 T.C.M. (CCH) 279, 1997 WL 438292 (1997); *Harford v. Commissioner*, 76 T.C.M. (CCH) 771, 1998 WL 774658 (1998); *Keel v. Commissioner*, 73 T.C.M. (CCH) 3092, 1997 WL 331723 (1997); *Morabito v. Commissioner*, 74 T.C.M. (CCH) 62, 1997 WL 375584 (1997); *Phillips v. Commissioner*, 74 T.C.M. (CCH) 187, 1997 WL 412125 (1997); *Sodoma v. Commissioner*, 71 T.C.M. (CCH) 3178, 1996 WL 323683 (1996), *aff'd by unpublished opinion*, 139 F.3d 899 (5th Cir.1998); *Thorpe v. Commissioner*, 74 T.C.M. (CCH) 219, 1997 WL 419884 (1997); *Webb v. Commissioner*, 71 T.C.M. (CCH) 2004, 1996 WL 56969 (1996).

argues that the releases plaintiffs signed in exchange for payment do not constitute tort "settlements" "in lieu of litigation," as required under section 104(a)(2), because plaintiffs have stipulated that they never formally or informally asserted, threatened, or informed IBM of an individual claim against IBM for personal injury.[14] In the alternative, defendant argues that even if the releases in exchange for payments constitute a settlement of potential claims, plaintiffs cannot meet the two *Schleier* tests. Specifically, defendant argues that plaintiffs have failed to "demonstrate that the underlying cause of action giving rise to the recovery is 'based upon tort or tort type rights.'" *Id.* Defendant next argues that even if plaintiffs meet the first prong of *Schleier*, they cannot satisfy the second because plaintiffs presented no evidence to show that IBM paid them "on account of" any personal injury claims. Defendant argues that, as a matter of law, where, as here, a settlement agreement addresses a number of claims, and the parties do not allocate any portion of the payment for tort damages, the court must consider the entire amount taxable. *See Pipitone,* 180 F.3d at 862; *Taggi,* 35 F.3d at 96.

Plaintiffs argue, in response, that the lump-sum payments they received from IBM in exchange for a release are settlement payments and that they are tax-exempt as payments for personal injury and sickness under section 104(a)(2). Relying on *Agar v. Commissioner,* 290 F.2d 283 (2nd Cir.1961),[15] plaintiffs contend that to prevail they need only show that IBM's basic reason for insisting on the release was to avoid tort claims. Plaintiffs argue that they have adduced facts to show that IBM was concerned about its potential tort liability and therefore only paid

those employees who agreed to waive their tort claims. Plaintiffs argue that these facts show that the payments properly may be characterized as tort settlement payments "in lieu of litigation."

Plaintiffs argue based on the same facts that they have satisfied the two prongs of the *Schleier* test. Under plaintiffs' analysis, the first prong of *Schleier* is satisfied by showing that their release covered tort claims. According to plaintiffs, if tort claims are present, the court must allocate between the non-taxable portion of the payment attributable to tort claims and the taxable portion of the payment attributable to non-tort claims. Plaintiffs suggest that the court should base this allocation on the relative liability risks IBM faced from the two types of claims. Plaintiffs maintain that the record indicates that IBM "implicitly" determined that all, or nearly all, of its financial risk from employee claims and lawsuits, and thus the financial risk that was avoided by the release, was attributable to tort claims, rather than non-tort claims. Plaintiffs' sole evidence to support this view is derived from Mr. Reibstein, plaintiffs' expert witness, who concluded that (1) of the entire risk of liability to which IBM was exposed from employees participating in the voluntary downsizing program, approximately 95% of the risk was attributable to tort claims, and (2) of the entire risk of liability to which it was exposed from employees participating in the involuntary downsizing programs, approximately 85% of the risk was attributable to tort claims.

Plaintiffs argue that they also have met the second or "on account of" prong under *Schleier.* Plaintiffs contend that under the second *Schleier* prong, payments for tort

---

14. Plaintiffs also stipulated that they had not experienced any tort-related injury symptoms before signing their releases. Plaintiffs seek to overcome the inference that they did not, therefore, have a claim, with the statement of Dr. Peter, who (without meeting any of the plaintiffs) contends that each of the plaintiffs was in fact emotionally harmed by the downsizing programs. While the court seriously questions Dr. Peter's methodology, the court will allow Dr. Peter's statement into evidence for the limited purpose of showing that downsizing programs may result in emotional stress, a fact defendant does not dispute.

15. In *Agar* the Second Circuit decided that the payment Agar received in settlement of his employment-related slander claim was not excludable from gross income under section 104(a)(2) on the grounds that it was in the nature of a severance payment. *See Agar,* 290 F.2d at 284. In deciding the case the Second Circuit stated that "the ultimate inquiry" to be applied in characterizing settlement payments "is into the 'basic reason' for the company's payment." *Id.*

damages are excluded from income except to the extent they represent punitive or liquidated damages, interest designed to compensate the claimant for the delay in payment, or damages that compensate the taxpayer for purely economical harms that are inherently unrelated to personal injuries. Plaintiffs maintain that no portion of the lump-sum payment that is allocable to tort claims falls into any of these taxable categories.

While the test-case plaintiffs' arguments are creative, they have failed to prove that the payments they received from IBM are excludable from income taxation under section 104(a)(2). Viewing the facts and inferences from the facts most favorably to plaintiffs, they arguably have shown that IBM's decision to require "releases" stemmed from its concern over potential tort claims. Plaintiffs have not, however, adduced any evidence to show that the "payments" or "recovery" they received from IBM were in any way tied to that concern. For the reasons discussed below, the court concludes that proof of IBM's generalized reasons for wanting a release from its downsized employees is not sufficient to show that IBM paid these plaintiffs to settle their potential tort claims.

As a threshold matter, the court agrees with defendant that plaintiffs' exchange of releases for payment does not necessarily establish settlement agreements between plaintiffs and IBM. As defendant notes, plaintiffs do not allege, nor does the record otherwise show, that any of the plaintiffs ever made any formal or informal claim against IBM. Moreover, plaintiffs have stipulated that they never experienced any symptoms of personal injury or sickness. In such circumstances, there is no basis for any individual "settlement agreements" between plaintiffs and IBM. *See Taggi v. U.S.,* 835 F.Supp. 744, 746 (S.D.N.Y.1993), *aff'd,* 35 F.3d 93 (1994); *Morabito,* 74 T.C.M. (CCH) at 64. While plaintiffs rely on cases to show

that assertions of a claim are not necessary to show a settlement, none of these cases involved plaintiffs who had stipulated that they, in effect, did not have a claim for personal injury to assert because they were symptom free. Section 104(a)(2) requires proof of the existence of a "bona-fide" tort claim. Because plaintiffs did not appear to have such a claim, the existence of a settlement is in doubt. *See Taggi,* 35 F.3d at 96; *Gajda,* 158 F.3d at 805; *Lubart,* 154 F.3d at 542; *Morabito,* 74 T.C.M. (CCH) at 64.

However, even if the court were to agree that the releases plaintiffs signed in exchange for payment amounted to settlement agreements with IBM, plaintiffs have not shown that the payments they received were based on any one individual's tort or tort-type claims, as required by the first prong of *Schleier.* The payments these plaintiffs received were based on the same salary and years of service formula as every other program participant. In such circumstances, there is no basis for the court to conclude that the payments they received, as individuals, were to settle tort claims. The first prong of *Schleier* is predicated on proof of an individual bona fide claim. While plaintiffs argue that they have satisfied *Schleier*'s first prong by showing IBM's generalized concern over potential tort liability, the court does not read *Schleier* as allowing individuals to rely on IBM's generalized concerns over tort liability to support any one individual's tort claim.[16] *See Gajda,* 158 F.3d at 805 ("Under [plaintiff's] argument, the mere fact that IBM foresaw lawsuits arising out of the ITO II program meant that the payment was in part a settlement of those potential future claims. This argument is contradicted by *Taggi v. United States.*") (citation omitted); *Lubart,* 154 F.3d at 542.

Finally and most importantly, however, even if plaintiffs are deemed to have satisfied

---

**16.** Plaintiffs rely on Mr. Berte's statement to support their contention that the reputations of employees leaving IBM under the downsizing programs were damaged by the alleged public statements of IBM executives that IBM was using the downsizing process to weed out "deadwood" and underperformers. This is not sufficient to satisfy *Schleier's* first prong. These statements do not prove that IBM paid plaintiffs a portion of their salary to resolve these claims. Plaintiffs' reliance on Dr. Peter's statement that they were, in fact, emotionally damaged by the downsizing program also is misplaced. Section 104(a)(2) is focused on the basis for the "recovery." Plaintiffs did not present any evidence to show that their individual payments, in any way, reflected this "damage."

the first prong of *Schleier* by relying on IBM's generalized concerns over tort liability, they cannot satisfy the second *Schleier* prong and, thus, their claims must fail. None of the evidence plaintiffs presented shows that the "recovery" they received was paid "on account of" personal injury or sickness. At the heart of plaintiffs' argument is the erroneous assumption that proof of IBM's generalized concerns about tort claims, which they contend led to IBM's insistence on tort releases, also proves that IBM paid these plaintiffs "on account of" their personal injuries. Under plaintiffs' view they have no burden to show separately that the payments they received were in any way calculated or allocated to reflect their personal injuries, on either an individual or aggregate basis. In essence, plaintiffs are arguing that under the Supreme Court decision in *Schleier*, the test for excludability is so broad that a general release of tort and other claims in exchange for payment mandates that the court simply allocate the portion paid "on account of" tort. In *Schleier*, however, the Supreme Court made plain that to sustain a claim for exclusion, a taxpayer must show not only that the underlying claim was for personal injury, but also that the amount received was "on account of personal injuries." *Schleier*, 515 U.S. at 333, 115 S.Ct. 2159 ("The regulatory requirement that the amount be received in a tort type action is not a substitute for the statutory requirement that the amount be received 'on account of personal injuries or sickness'; it is an additional requirement.").

Here, plaintiffs cannot meet the second prong of *Schleier* on an individual basis. As noted above, plaintiffs never asserted or threatened a claim against IBM. Having failed to assert or threaten any claims as individuals in the first instance, plaintiffs have not proven that the payments to them, as individuals, were "on account of" injuries associated with any tort. The fact that IBM recognized that some of its more than 60,000 downsized employees may have had tort claims and therefore insisted on releases from all employees does not mean that IBM paid any one individual "on account of" his or her injuries arising from his or her alleged tort claim. *See Gajda*, 158 F.3d at 805; *Lubart*, 154 F.3d at 542. It is undisputed that these four test-case plaintiffs received payments based on the same salary and years of service formula and signed releases that were no different from any of the other program participants. Without evidence that the payment or release was individually tailored to reflect their individual injuries, plaintiffs' claims for a tax exclusion under section 104(a)(2) must be rejected as a matter of law.

Moreover, even if the court were to agree that plaintiffs do not have to satisfy the second *Schleier* test on an individual basis, plaintiffs, as a group, still cannot satisfy the "on account of" test. The uncontroverted evidence shows that IBM did not consider potential tort liability or personal injury claims in devising its payment formula.[17] First, IBM used the same salary plus tenure downsizing payment formula after insisting upon a release as it had used before it insisted upon a release. Thus, the formula was not influenced by potential tort claims. Second, IBM made plain in the release that a prorated portion of the payment would have to be returned if the employee was rehired. Tort damages are not "returnable," but payments in the nature of severance payments would be returnable. Third, IBM's uncontroverted testimony makes plain that IBM did not allocate any portion of its program

---

17. It is for this reason that plaintiffs' reliance on *Knevelbaard v. Commissioner*, 74 T.C.M. (CCH) 161 (1997), which involved a class-action tort settlement, is misplaced. That case involved a settlement arising from a tort class action suit where the sole claim was for tort and the payments clearly were paid "on account of" the tort claim. *See id.* at 169 (noting the statement of the chief representative of the party providing the settlement payments that "the money was paid ... 'for the value, if you will, of the emotional distress claims asserted by these individual ...

plaintiffs'"). The fact that the settlement was calculated using an agreed-upon formula does not change the fact that the payment was aimed at compensating the victims for their individual tort injuries.

In contrast to *Knevelbaard*, stands this case. Here there is absolutely nothing in the record before this court to suggest that IBM's downsizing payments were made based on any actual or threatened class action for tort by its downsized employees.

payments as compensation for possible tort claims. Nor did plaintiffs contradict IBM's express testimony that it did not ever consider tort claims in establishing its payment formula. In short, plaintiffs have not presented any evidence to show that the payments were made on account of personal injuries, as mandated by *Schleier.*

Indeed, in light of this uncontroverted evidence, plaintiffs' contention that the court should undertake an allocation is without any basis in law or fact.[18] As the Seventh Circuit recently stated in *Pipitone v. United States:*

> Finally, and perhaps most importantly, the record is devoid of any evidence demonstrating what, if any, portion of the payments made to Pipitone was allocable to his alleged claims of tort or tort-type damages for personal injuries and sickness. The failure of a party seeking to demonstrate that certain amounts are excludible from income to present such evidence results in the entire amount being presumed to be taxable.

180 F.3d at 865; *accord Taggi,* 35 F.3d at 96; *Brennan,* 74 T.C.M. (CCH) at 72; *Morabito,* 74 T.C.M. (CCH) at 64. The only time courts will allocate is where there is factual evidence, obtained in discovery after filing of an action or during negotiations over tort claims, to support an allocation for tort damages. The court is not aware of any decision where another court has allocated a downsizing payment or any other employee settlement payment in which the personal injury giving rise to the tort claim was not specifically litigated or negotiated. *See, e.g., Rob-inson v. Commissioner,* 70 F.3d 34 (5th Cir. 1995) (allocation based on a jury verdict); *Commissioner v. Miller,* 914 F.2d 586 (4th Cir.1990), *aff'd after remand by unpublished opinion,* 60 F.3d 823, 1995 WL 386790 (4th Cir.1995) (allocation based on a prior jury award); *Greer v. United States,* No. 96–117, 1998 WL 786480 (E.D.Ky. Sept. 23, 1998) (allocation based on amount that individually negotiated termination settlement was different from the normal severance package).[19] Plaintiffs have not provided the court with any reason to depart from the reasoning of those cases.

In sum, it is clear from the undisputed facts that the payments IBM made were not tied to plaintiffs' tort claims and were not paid "on account of" any personal injuries. It is for all of these reasons that plaintiffs have failed to meet the essential elements of their case and that summary judgment for the United States is appropriate.

### III. The Payments Properly Were Characterized As "Wages"

Plaintiffs also seek a refund of the FICA taxes withheld from their IBM payments. Plaintiffs base their claim for a refund on two alternative grounds. First, plaintiffs argue that to the extent the payments are excludable from income under section 104(a)(2) they are not subject to FICA. In the alternative, plaintiffs argue that even if the payments are included as income, they are not "wages" subject to FICA, because the payments were not based on "remuneration for services" as required under FICA. As the court already

---

**18.** Although the court will admit Mr. Reibstein's statement, the statement does not further plaintiffs' case. Mr. Reibstein's conclusions do not provide a basis upon which the court can base an allocation of the payments. Importantly, although Mr. Reibstein assessed IBM's liability risks, he never tied the percentage risk to the amount of the payments. Mr. Reibstein's declaration that 95% of IBM's liability risk was due to possible tort liability does not prove that 95% of each payment was calculated and then paid to "settle" a possible tort claim. As a result, it does not follow that the payments should be allocated on a relative risk basis. Plaintiffs have failed to show that the payments were calculated on the basis of actual or potential personal injury claims. To the contrary, the undisputed evidence shows that payments were not tied in any way to personal injury claims, but were based instead on rate of salary and years of service. Plaintiffs cannot refute this fact. Moreover, expert opinions, like Mr. Reibstein's, that are based on theoretical speculation and unsupported assumptions, do not establish a factual dispute. *See Jones v. National Distillers,* 484 F.Supp. 679, 683 (S.D.N.Y.1979) (citing *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir. 1977)).

**19.** While the court does not necessarily agree with all of the conclusions of the *Greer* court, at bottom that decision rests on the belief that plaintiff had a bona fide claim and was paid more than six times the normal severance payment for that claim. *See Greer,* 1998 WL at *1, *5.

has decided that IBM's payments to plaintiffs properly were included as income and not excludable under section 104(a)(2), plaintiffs' first argument must fail. In addition, for the reasons set forth below, the court concludes that the payments were based on remuneration for employment and, therefore, properly were taxed as "wages" under FICA.

■ Section 3102(a) of the Internal Revenue Code requires every employer to deduct FICA taxes from their employees' "wages" at the time of payment. 26 U.S.C. § 3102(a). Section 3121(a) defines "wages" for purposes of FICA to mean "all remuneration for employment." *Id.* § 3121(a). "Employment," in turn, is defined as "any service, of whatever nature performed by an employee for the person employing him." *Id.* § 3121(b). The Supreme Court has made plain that the term "remuneration for employment" is not limited to payments made for work that has already been performed. The Supreme Court has construed the term "service" to mean "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Social Sec. Bd. v. Nierotko,* 327 U.S. 358, 365–66, 66 S.Ct. 637, 90 L.Ed. 718 (1946); *accord Gerbec v. United States,* 164 F.3d 1015, 1026 (6th Cir.1999) ("We hold that the phrase 'remuneration for employment' includes certain compensation in the employer-employee relationship for which no actual services were performed."); *Mayberry v. United States,* 151 F.3d 855, 860 (8th Cir.1998); *Hemelt v. United States,* 122 F.3d 204, 209 (4th Cir. 1997); *Associated Elec. Coop. v. United States,* 42 Fed.Cl. 867, 872, 873–74 (1999). Indeed, in 1983 Congress amended FICA to provide that all payments arising from the employer-employee relationship that are not expressly excluded in the twenty-one exceptions under section 3121(a) should be subject to FICA.[20]

■ Thus, the issue before the court is whether the payments at issue here are payments arising out of the entire employer-employee relationship within the meaning of *Nierotko.* Defendant argues that the payments are best characterized as separation or severance payments that arise from the employer-employee relationship and are therefore properly subject to FICA taxes. Since 1950 the IRS consistently has maintained that severance or separation payments are subject to FICA. *See* S. REP. No. 81–1669, at 130 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3482.

Plaintiffs argue, in response, that the payments are not severance payments and are exempt from FICA as either settlement payments or payments to induce them to leave. If the payments are construed to be settlement payments, plaintiffs argue that the payments should be excluded from FICA because payments made to secure releases of employment-related claims do not arise from the employer-employee relationship. Plaintiffs argue further that "common sense" dictates that payments to induce employees to leave do not arise from the employer-employee relationship. Either way, plaintiffs contend, the payments are not wages subject to FICA taxes. For the reasons discussed below, plaintiffs' arguments are without merit.

The court agrees with plaintiffs that the payments at issue here are not simply "severance" payments because of the release IBM required each recipient to sign. This is not to say, however, that the payments did not arise from the employer-employee relationship. The undisputed facts show that IBM calculated the payments solely on the basis of employment tenure and salary basis, which is consistent with the notion of a "wage." *See Mayberry,* 151 F.3d at 860; *Hemelt,* 122 F.3d at 210; *Associated Elec.,* 42

---

20. The Senate Report discussing these amendments states, in pertinent part:

    The social security program aims to replace the income of beneficiaries when that income is reduced on account of retirement and disability. Thus, the amount of "wages" is the measure used both to define income which should be replaced and to compute FICA tax liability. Since the social security system has objectives which are significantly different from the objectives underlying the income tax withholding rules, your Committee believes that amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.

S. REP. No. 98–23, at 42 (1983), *reprinted in* 1983–2 U.S.C.C.A.N. 143, 299.

Fed.Cl. at 876. Under both its voluntary and involuntary programs, IBM's payments were tied solely to these criteria, which had been the same criteria used when the programs were purely severance programs. As noted above, the release requirement did not change the amount of pay. In fact, the release itself made plain that a prorated portion of the payment would have to be returned if the employee returned to work at IBM. This clearly indicates that the payments were considered to be a substitute for wages and that the payments were part of the employer-employee relationship.

Finally, other cases involving settlement payments to downsized workers have held that payments made to downsized employees that are based on length of service and rate of pay properly are considered "wages" subject to FICA taxes. Courts have reached this conclusion even where the payments were made to settle other claims or were made as incentive payments to encourage employees to leave. *See Mayberry v. United States,* 151 F.3d 855, 860 (8th Cir.1998); *Hemelt v. United States,* 122 F.3d 204, 209 (4th Cir.1997); *Associated Elec. Coop. v. United States,* 42 Fed. Cl. 867 (1999).[21] In each of these cases the courts have looked beyond the settlement to determine the basis upon which the payments were calculated. And where, as here, the payments were calculated on a formula based solely upon the former employees' length of service and rate of pay, the payments have been deemed wages and subject to FICA taxes.[22] *See Mayberry,* 151

F.3d at 860; *Hemelt,* 122 F.3d at 210; *Associated Elec.,* 42 Fed.Cl. at 876; *see also Lane Processing Trust v. United States,* 25 F.3d 662, 666 (8th Cir.1994) (basing determination that proceeds from sale of company distributed to former employees were "wages" on the fact that the distributions were "linked to location, prior wages, length of service, and other factors traditionally used to determine employee compensation").

This court sees no reason to depart from these precedents. In this court's view, the fact that plaintiffs were required to give up certain claims to obtain the program payments does not change the wage-like or severance-like character of the payments. Whether these payments are settlement payments or were paid to entice employees to leave is not determinative because the payments at issue clearly were derived from a severance-type formula based on the employee-employer relationship. Thus, the payments were properly held to constitute wages subject to FICA under 26 U.S.C. § 3121(a).[23]

## CONCLUSION

For the reason set forth above, the cross-motion for summary judgment of the United States is **GRANTED**. Plaintiffs' cross-motion for summary judgment is **DENIED**. There being no just reason for delay, the clerk of the court shall enter judgment under Rule 54(b) for the United States as to Douglas R. Willoughby, Suzanne M. Hill, Nathan

---

**21.** The court recognizes that the *Mayberry, Hemelt,* and *Associated Electric* decisions arose from different facts. Despite the differences, the court finds it instructive that these cases looked to the method of calculating the payment at issue as a basis for determining whether or not the payment was a wage. Moreover, the court recognizes that the Fifth Circuit decision in *Dotson v. United States,* 87 F.3d 682 (5th Cir.1996), is favorable to the plaintiffs, and holds that settlement payments based on ERISA violations are not "wages" in the downsizing process. This court believes that *Mayberry* and *Hemelt,* which involve payments under the same class action settlement as *Dotson,* represent the better view.

**22.** Plaintiffs argue that dicta in the Supreme Court's *Lockheed Corp. v. Spink,* 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), decision and the Fourth Circuit's *Waterman v. Commis-*

*sioner,* 179 F.3d 123 (4th Cir.1999), decision compel a different result. *Lockheed* involved the question of whether a company's early retirement programs were prohibited transactions under ERISA. *Waterman* considered whether or not a payment to an enlisted member of the Navy was excludable from income under 26 U.S.C. § 112(a), as compensation for "active service." Both *Lockheed* and *Waterman* concerned different tax provisions than the one at issue here and therefore are not controlling.

**23.** Plaintiffs also rely on IBM's refund action for the employer portion of these taxes to support their contention that the payments were not wages. This reliance is misplaced. IBM expressly has stated that it filed its action as a "protective" action in the event the court were to decide the payments were not wages.

J. Marciano, and Barbara C. Jordan.   Each party to bear its own costs.