T.C. Memo. 1997-358

UNITED STATES TAX COURT

JOYCE M. AND THOMAS J. HAMM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2400-96.                    Filed August 5, 1997.

Joyce M. Hamm and Thomas J. Hamm, pro sese.

<u>Amy A. Campbell</u>, for respondent.

MEMORANDUM OPINION

WELLS, <u>Judge</u>:  This case is before the Court on respondent's
motion for summary judgment pursuant to Rule 121(a).[1]

_____

[1]     Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years at
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

Respondent determined a deficiency in petitioners' 1992 Federal income tax in the amount of $21,714.06 and an addition to tax pursuant to section 6651(a)(1) in the amount of $92.61.

In support of respondent's motion for summary judgment, respondent filed an affidavit along with exhibits.  Petitioners filed a written response and submitted an affidavit and an exhibit opposing respondent's motion.

After a concession,[2] the issue to be decided is whether petitioners may exclude from income, pursuant to section 104(a)(2), a payment that petitioner Thomas J. Hamm (petitioner) received from his employer in exchange for signing a general release and covenant not to sue.

A motion for summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); O'Neal v. Commissioner, 102 T.C. 666, 674 (1994) (citing Kroh v. Commissioner, 98 T.C. 383, 389 (1992)).  The moving party bears the burden of establishing that these requirements are met.  O'Neal v. Commissioner, supra at 674, and

_____

[2]    Petitioners have not contested respondent's determination that petitioners are liable for the sec. 6651(a)(1) addition to tax in the amount of $92.61.  Accordingly, we consider petitioners to have conceded the issue.  Rybak v. Commissioner, 91 T.C. 524, 566 (1988).

cases cited threat. The factual materials and the inferences to be drawn from them must be viewed in the light most favorable to the party opposing the motion. Blanton v. Commissioner, 94 T.C. 491, 494 (1990). The opposing party cannot rest upon mere allegations or denials set forth in that party's pleadings, O'Neal v. Commissioner, supra at 674, and must make a showing sufficient to establish the existence of each element essential to that party's case and on which that party will bear the burden of proof at trial, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (interpreting Fed. R. Civ. P. 56(c), on which Rule 121(b) is based).

In deciding the instant motion, we set forth a summary of the facts relevant to our discussion. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). The facts presented below are based on the parties' pleadings and moving papers, and other relevant materials in the record and are viewed in terms most favorable to petitioners. Blanton v. Commissioner, supra at 494.

Background

At the time they filed their petition in the instant case, petitioners resided in Marietta, Georgia. During at least January through July 1992, petitioner was employed by International Business Machines Corp. (IBM). On July 28, 1992, petitioner was informed by his manager, Catherine F. Allman, that the project to which he was assigned would no longer be funded

after October 1992 and that he should find another position within IBM or sign up for the IBM Modified and Extended Individual Transition Option Program (the ITO II Program). The ITO II program provided a lump-sum cash payment and other benefits in exchange for signing a General Release and Covenant Not to Sue (the release).

On July 31, 1992, after 2 days of unsuccessfully seeking another position within IBM, petitioner signed up for the ITO II program and executed the release, which provided in relevant part:

> If you feel that you are being coerced to sign this release or that your signing would for any reason not be voluntary, or you believe the process by which you have been offered this release or the payment in exchange for this release is discriminatory, * * * you are encouraged to discuss this with your management or Personnel before signing this release. * * *

> In exchange for the sums and benefits which you will receive pursuant to the terms of the * * * [ITO II Program], Thomas J. Hamm[3] (hereinafter "you") agrees to release * * * [IBM] from all claims, demands, actions or liabilities you may have against IBM of whatever kind, including but not limited to those which are related to your employment with IBM or the termination of that employment. You agree that this also releases from liability IBM's agents, directors, officers, employees, representatives, successors and assigns (hereinafter "those associated with IBM"). * * * You also agree that this release covers, but is not limited to, claims arising from the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, and any other federal or state law dealing with discrimination in employment on the basis of sex, race, national origin,

---

[3] The name Thomas J. Hamm was typed into a space provided in the Release.

religion, disability, or age.  You also agree that this release includes claims based on theories of contract or tort, whether based on common law or otherwise. This release does not include your vested rights, if any, in the IBM Retirement Plan, which survive unaffected by this release.

\*     \*     \*     \*     \*     \*     \*

3.   This release does not waive any claims that you may have which arise after the date you sign this release.

\*     \*     \*     \*     \*     \*     \*

6.   In the event of rehire by IBM or any of its subsidiaries as a regular employee, you understand that IBM reserves the right to require repayment of a prorated portion of the ITO II Program payment.  The amount of repayment will be based on the number of weeks off the IBM payroll compared with the number of weeks' salary used to calculate your payment.

The Pre-Retirement Leave of Absence Agreement provides:

Your leave will begin 08/01/92 and will end 12/31/00.  Based on your committed plan to retire immediately following your leave, your effective date of retirement will be 12/31/00.[4] Once your leave begins, the committed retirement date may not be changed to a later one; however, an earlier date upon which you are retirement eligible will be allowed.

In exchange for participating in the ITO II Program, petitioner received a payment of $71,809.69 (the ITO payment). According to respondent's motion, as of the date of the motion, petitioner had not filed any "tort-type" claims against IBM.

For calendar year 1992, petitioner received a Form W-2 from IBM showing wages of $132,521.60 and Federal income tax withheld of $22,982.60, and a Form W-2 from Management Recruiters

---

4     The dates were either typed or handwritten in the space provided in the Pre-Retirement Leave of Absence Agreement.

International, Inc., showing wages of $2,650 and no Federal income tax withheld for that year. On their 1992 joint Federal income tax return, petitioners reported $61,040.31 as wage income (line 7). Petitioners attached to their return a Form 8275 Disclosure Statement asserting that the ITO payment in the amount of $71,809.69 was excludable from their gross income pursuant to section 104(a)(2) "as a payment received in exchange for the release and settlement of tort-type rights, as part of IBM Corp.'s ITO II Program".

Respondent determined that petitioners did not establish that any amount was excludable from their gross income pursuant to section 104(a)(2). Consequently, respondent increased petitioners' gross income by $74,131.29 to conform to the amounts reported on petitioner's Forms W-2. Additionally, respondent disallowed itemized deductions in the amount of $966.08 as an automatic adjustment resulting from the increase in petitioners' gross income.

## Discussion

The instant case is another among many in this Court where we have been presented with the issue of whether proceeds received pursuant to IBM's ITO II program are excludable from the recipient's gross income pursuant to section 104(a)(2). See, e.g., Gajda v. Commissioner, T.C. Memo. 1997-345; Lubart v. Commissioner, T.C. Memo. 1997-343; Thorpe v. Commissioner, T.C. Memo. 1997-342; Phillips v. Commissioner, T.C. Memo. 1997-336;

Brennan v. Commissioner, T.C. Memo. 1997-317; Morabito v. Commissioner, T.C. Memo. 1997-315; Keel v. Commissioner, T.C. Memo. 1997-278; Webb v. Commissioner, T.C. Memo. 1996-50.

In deciding the instant motion for summary judgment, we must examine whether respondent has established that, as a matter of law, petitioners are not entitled to exclude the ITO payment from gross income pursuant to section 104(a)(2). Except as otherwise provided, gross income includes income from all sources. Sec. 61(a); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-430 (1955). Although section 61(a) is to be broadly construed, statutory exclusions from income must be narrowly construed. Commissioner v. Schleier, 515 U.S. 323, 328 (1995).

Section 104(a)(2) provides that gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness". The regulations provide that "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs. Accordingly, to exclude damages received by settlement agreement from gross income pursuant to section 104(a)(2), the taxpayer must establish that: (1) The cause of action giving rise to the recovery is "based upon tort or tort type rights", and (2) the damages were

received "on account of personal injuries or sickness". Sec. 104(a)(2); Commissioner v. Schleier, supra at 337.

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement controls whether such amounts are excludable from gross income pursuant to section 104(a)(2). United States v. Burke, 504 U.S. 229, 237 (1992). The critical question is "in lieu of what were damages awarded" or paid. Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987); see Bagley v. Commissioner, 105 T.C. 396, 406 (1995). Consideration of the nature of the claim is a factual inquiry. Robinson v. Commissioner, 102 T.C. 116, 127 (1994), affd. in part, revd. in part and remanded 70 F.3d 34 (5th Cir. 1995).

If the settlement agreement lacks express language stating the purpose for which the settlement proceeds were paid, then the most important factor in deciding whether the section 104(a)(2) exclusion applies is the intent of the payor as to the purpose in making the payment. Stocks v. Commissioner, 98 T.C. 1, 10 (1992), and cases cited therein. If the payor's intent cannot be clearly discerned from the settlement agreement, we examine all of the facts and circumstances in the case. Robinson v. Commissioner, supra at 127.

In the instant case, respondent contends that petitioner's failure to file a claim prior to signing the release precludes petitioners' exclusion of the ITO payment from gross income

pursuant to section 104(a)(2). Respondent cites Taqqi v. United States, 35 F.3d 93, 96 (2d Cir. 1994), where the court concluded, after noting that no "claims or threats of litigation" existed, that the settlement payment "did not constitute a 'settlement agreement entered into in lieu of . . . [a legal suit or action based upon tort or tort type rights].'" The court expressly stated that "Because no prosecution of a suit for personal injuries" preceded the settlement, the taxpayer's right to exclude the settlement proceeds from gross income "depends upon whether the [settlement] agreement constituted a 'settlement agreement . . . in lieu of such prosecution.'" Id. at 95. Accordingly, the court examined whether the settlement proceeds were attributable to a bona fide dispute based upon tort or tort type rights. Contrary to respondent's interpretation of Taqqi, we view the court's statement that no "claims or threats of litigation" existed as merely supporting the court's conclusion that the settlement proceeds were not attributable to a bona fide dispute based upon tort or tort type rights, not a statement of law that the failure to file a claim before signing a settlement agreement precludes exclusion of the settlement proceeds from gross income pursuant to section 104(a)(2).

As stated supra, pursuant to section 104(a)(2) and the regulations thereunder, the exclusion from gross income applies to damages received by "suit" or by "settlement agreement" in lieu of such a suit. Respondent has not cited, and we have not

found, any authority for the proposition that the taxpayer must file a claim prior to the settlement agreement in order for the settlement proceeds to qualify for the exclusion. Accordingly, we reject respondent's argument that the failure to file a claim prior to signing the release precludes exclusion of the ITO payment from gross income pursuant to section 104(a)(2).

We do note, however, that the failure to file such a claim may be taken into account in deciding whether the taxpayer released a tort or tort type claim. See Webb v. Commissioner, T.C. Memo. 1996-50. Additionally, we have specifically stated that a claim need not have been previously asserted against the employer, although the absence of any knowledge of the claim on the part of the employer-payor has a negative impact in concluding whether the employer-payor had the requisite intent of making the payment "on account" of a personal injury. Keel v. Commissioner, T.C. Memo. 1997-278; Sodoma v. Commissioner, T.C. Memo. 1996-275.

Based on our review of the facts and circumstances in the instant record, we conclude that the ITO payment was severance pay to petitioner and not settlement proceeds for the release of tort or tort type claims. Several considerations support our conclusion. On July 28, 1992, petitioner was informed that the project to which he was assigned would no longer be funded after October 1992 and that he should find another position within IBM or sign up for the ITO II program. On July 31, 1992, after 2

days of unsuccessfully seeking another position within IBM, petitioner signed up for the ITO II program and executed the release and the Pre-Retirement Leave of Absence Agreement. The foregoing sequence of events supports our conclusion that the ITO payment was severance pay to petitioner.

Additionally, we find support in the ITO II program documents[5] for our conclusion that the ITO payment was severance pay. Paragraph 6 of the release provides the terms for repaying the ITO payment in case of rehire by IBM and states: "The amount of repayment will be based on the number of weeks off the IBM payroll compared with the number of weeks' salary used to calculate your payment." (Emphasis added.) The fact that the number of weeks of petitioner's salary was used in calculating petitioner's ITO payment makes the ITO payment appear to be severance pay and not damages for personal injuries. Moreover, the Pre-Retirement Leave of Absence Agreement provides: "Your leave will begin 08/01/92 and will end 12/31/00. Based on your committed plan to retire immediately following your leave, your effective date of retirement will be 12/31/00. Once your leave begins, the committed retirement date may not be changed to a

_____

[5] The ITO II program documents in the instant case include an apparently complete set of documents related to the ITO II program (with an unsigned release and unsigned Pre-Retirement Leave of Absence Agreement) that was submitted by petitioners with their trial memorandum, and the executed release and executed Pre-Retirement Leave of Absence Agreement that were submitted by respondent in the affidavit supporting the instant motion.

later one".  The fact that the ITO II program provided for a leave of absence which ultimately determined the effective date of petitioner's retirement further supports our conclusion that the ITO payment was severance pay related to retirement.

Our conclusion is further supported by the fact that the ITO II program was implemented to "reduce the number of employees" and to "help IBM become more competitive and efficient".  The first page of the ITO II program documents includes a "Summary Plan Description" that states:

> Due to staffing dynamics and IBM's need to become more competitive and efficient, IBM intends to reduce the number of employees in eligible skill families at various locations. * * * The program is intended to help IBM become more competitive and efficient by reducing its workforce while retaining essential skills and to assist employees who choose to participate in the program in making the transition into a new career or retirement.  The ITO II program is voluntary; however, if we do not have sufficient volunteers for the ITO II program, IBM will continue to take involuntary actions in the near future * * *

The fact that eligibility for participation in the ITO II program was determined, in part, by whether the employee's position fell within certain "functional skill families" also supports our conclusion.  Eligibility for participation in the ITO II program was determined as follows:

> The ITO II Project Office will establish 'functions' within IBM.  Within each function, the Project Office will group similar skills together into 'families' creating functional skill families.  Based on these business decisions, management will decide which functional skill families are eligible to participate in the program. * * *

Furthermore, the method used by IBM in calculating the ITO payment supports our conclusion. The ITO payment was calculated as follows:

> Employees who are approved for and comply with the terms of the ITO II program will receive the greater of eight weeks pay or one week's pay for each six months of service fully or partially completed, up to a maximum of 52 weeks' pay. * * * The payment will be made in a lump sum and be based on the employee's regular salary and years of service as of the day he or she leaves active employment. * * * This payment is in lieu of any other form of separation pay or exit incentive program to which the employee is, may or might have become entitled. It is IBM's intent to pay only one incentive/separation type payment to an employee. * * *

Indeed, in making the ITO payment, which was to be "in lieu of any other form of separation pay or exit incentive program", IBM's intent appears to be to "pay only one incentive/separation type payment to an employee". (Emphasis added.) Accordingly, based on our review of the facts and circumstances in the instant record, we conclude that the ITO payment was paid by IBM to petitioner as severance pay, not to release a tort or tort type claim.

As respondent has made a prima facie case that the requirements of the section 104(a)(2) exclusion are not met, petitioners cannot rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. at 322; O'Neal v. Commissioner, 102 T.C. at 674. Petitioners contend that they are entitled to exclude the ITO payment from gross income pursuant to

section 104(a)(2) because the ITO II program was "designed to avoid prosecution of a legal suit or action based upon tort or tort-type rights".[6]  Petitioners allege that, because employees who filed claims within 7 days of signing the ITO II agreement had to return any settlement payments, the settlement payment was made to avoid tort type litigation.  Alternatively, petitioners contend that Ms. Allman caused injury to petitioners by coercing petitioner to sign up for the ITO II program and to terminate from IBM.  Additionally, petitioners allege that, as a result of having to sign up for the ITO II program and to terminate employment with IBM through coercion and duress, petitioner had to accept a minimum-wage position to start a new career, suffered periods of unemployment, assumed debts totaling $25,000, and experienced great personal and family stress.  As a final alternative, petitioners contend that they would have suffered even greater injury by filing "a claim against IBM instead of accepting the ITO II settlement".

Petitioners' allegations are merely conclusions and not specific allegations of fact that, if true, would support a finding that the ITO payment was for personal injury or sickness as required by section 104(a)(2).  For purposes of the instant

---

[6]    Additionally, we note that, in their petition, petitioners contested the deficiency on the grounds that the ITO payment "was made, under taxpayer duress, as consideration to the taxpayer for release of employer for any claim the taxpayer may have against employer for age discrimination and other potential tort claims."

motion, we accept as true that petitioner suffered injury when Ms. Allman coerced petitioner to sign up for the ITO II program and to terminate from IBM, that petitioner experienced great personal and family stress as a result of his having to sign up for the ITO II program and to terminate employment with IBM through coercion and duress, and that petitioners would have suffered even greater injury by filing a suit against IBM instead of accepting the ITO payment. Petitioners, however, have alleged no specific facts showing that the injuries they cited were: (1) The basis for a tort or tort type claim against IBM that petitioner released when he signed the ITO II program release and (2) the basis on account of which IBM made the ITO payment. Even if the injuries cited by petitioners could form the basis for some tort or tort type claim against IBM (and we do not so find in this opinion), such a claim would not be a basis for concluding that the ITO payment was made by IBM on account of such injuries.

In sum, petitioners have alleged no specific facts showing that petitioner had a tort or tort type claim[7] against IBM that he released in exchange for the ITO payment. Additionally,

---

[7] As we discussed supra, to exclude a settlement payment pursuant to sec. 104(a)(2), the taxpayer need not file a claim. However, the taxpayer must have a claim that is bona fide but not necessarily valid; i.e., sustainable. Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part and remanded 70 F.3d 34 (5th Cir. 1995); Stocks v. Commissioner, 98 T.C. 1, 10 (1992).

petitioners have alleged no specific facts showing that the ITO payment was allocable to tort or tort type damages for personal injuries or sickness.

Viewing the facts in a light most favorable to petitioners, Blanton v. Commissioner, 94 T.C. at 494, we conclude that respondent has made a prima facie case that petitioner did not release any tort or tort type claim in exchange for the ITO payment. Petitioners have failed to offer countervailing assertions having sufficient specificity to cause us to conclude that there is any genuine issue of material fact which requires a trial. We have considered all of the parties' remaining arguments and find them to be without merit. Under these circumstances, respondent is entitled to summary judgment as a matter of law. Rule 121(d); Abramo v. Commissioner, 78 T.C. 154, 164 (1982). As petitioners' gross income is increased in the amount of $74,131.29, we sustain respondent's disallowance of itemized deductions in the amount of $966.08 as an automatic adjustment.

To reflect the foregoing,

Respondent's motion for summary judgment will be granted, and decision will be entered for respondent.