**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-60736
_____


NEIL D. LUBART; VY LUBART

                              Petitioners-Appellants,

                    VERSUS

          COMMISSIONER OF INTERNAL REVENUE,

                              Respondent-Appellee.


_____

Appeal from the Decision
of the United States Tax Court
_____

September 28, 1998

Before DeMOSS, PARKER, and DENNIS, Circuit Judges.

PER CURIAM:

    Petitioner Neil D. Lubart appeals the Tax Court's summary judgment against him on his claim that $74,985 of income received upon his resignation constituted payment on account of sickness or personal injury excludable under section 104(a)(2) of the Internal Revenue Code. Because the allegations in the pleadings demonstrate that IBM offered the payment in lieu of damages and not to settle a claim for personal injury, we affirm.

                              A.

    Lubart was a successful engineer employed with International

Business Machines Corp. (IBM) until 1992. At some point in 1992, Lubart became eligible to participate in IBM's Modified and Extended Individual Transition Option Program (ITO II). This program was implemented as part of IBM's effort to reduce the size of its workforce and was offered to all employees who met certain age and job category requirements. Under the voluntary program, employees could choose to accept a lump sum payment in return for their voluntary resignation and release of all potential claims against IBM arising out of their employment or its termination.

The agreement provided, in relevant part, that Lubart agreed as follows:

> to release International Business Machines corporation (hereinafter, IBM), from all claims, demands, actions or liabilities you may have against IBM of whatever kind, including but not limited to those which are related to your employment with IBM or the termination of that employment. You agree this also releases from liability IBM's agents, directors, officers, employees, representatives, successors and assigns (hereinafter "those associated with IBM"). You agree that you have executed this release on your own behalf, and also on behalf of any heirs, agents, representatives, successors and assigns that you may have now or in the future. You also agree that this release covers but is not limited to claims arising from the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, and any other federal or state law dealing with discrimination in employment on the basis of sex, race, national origin, religion, disability or age. You also agree that this release includes claims based on theories of contract or tort, whether based on common law or otherwise.
> ...
> 1. The benefits provided pursuant to the ITO Program constitute consideration for this release, in that these are benefits to which you would not have been entitled had you not signed the release.
> ...

3.  This release does not waive any claims which you may have that arise after the date you sign this release.
...
6. In the event of a rehire by IBM or any of its subsidiaries as a regular employee, you understand that IBM reserves the right to require repayment of a prorated portion of the ITO II Program payment.  The amount of the repayment will be based on the number of weeks off the IBM payroll compared with the number of weeks salary used to calculate your payment.

Lubart claims that he was coerced into resigning, but he did not complain of this or of any other tort claim to company officers, despite a clause in the contract suggesting that employees consider the offer carefully, consult with their attorneys, and discuss any tort claims with the company.[1]  He signed the release on July 31, 1992, apparently without doing any of these things.  He received a lump sum special incentive payment of $74,985 calculated, like other ITO II payments, on the basis of his years of service and rate of pay.  IBM withheld federal income taxes, social security taxes, and Medicare taxes from the payment.

---

[1] The relevant portion of the release agreement read as follows:

IBM ADVISES YOU TO CONSULT AN ATTORNEY BEFORE YOU SIGN THIS RELEASE

If you feel that you are being coerced to sign this release or that your signing would for any reason not be voluntary, or you believe the process by which you have been offered this release or the payment in exchange for this release is discriminatory, you are encouraged to discuss this with your management or Personnel before signing this release.  After reviewing the release with your attorney, you can discuss concerns you have with your manager or your attorney can contact legal counsel at your location.  You should thoroughly review and understand the effects of the release before signing it.

A footnote accompanying this paragraph described the potential discrimination claims an employee might have, including claims under the ADEA and state and local law.

The year after Lubart left IBM, his wife was diagnosed with Alzheimer's disease. Although Lubart had never suffered from depression before, after these events occurred he fell into a deep depression and sought treatment from three doctors.

When he filed his 1992 income tax return, Lubart excluded the special incentive payment from his gross income. He claimed on a Form 8275, "Disclosure Statement," that the income was a payment for personal injury excludable from income under Section 104(a)(2) of the Internal Revenue Code as a payment on account of sickness or personal injury. *See* 26 U.S.C. § 104(a)(2) (1998). The Commissioner assessed a deficiency of $22,553. Shortly thereafter, Lubart joined a suit with forty other taxpayers who had received early retirement payments from IBM. Because most of those taxpayers, unlike Lubart, had suffered nothing that might be interpreted as "personal injury" for which they might have had a claim against IBM, the Tax Court severed Lubart's case.

On May 22, 1997, the Commissioner filed a motion for summary judgment. In granting the motion, the Tax Court noted that the intent of the employer would determine the treatment of the payment. *See Knuckles v. Commissioner*, 349 F.2d 610, 612 (10th Cir. 1965). It found that the payment was in the nature of severance pay rather than of compensation for personal injury because Lubart had not asserted any claim at the time he signed the release, because the release was a standard document offered to all

4

employees, because the amount of the payment was calculated based on Lubart's salary and number of years of service, and because the agreement required repayment of a *pro rata* portion of the incentive payment depending on the employee's length of time between the resignation and the rehire. Finally, the court noted that the release makes no attempt to allocate the payment between severance pay and personal injuries, and that Lubart had offered no facts upon which an allocation could be based.

B.

Summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." TAX COURT RULES OF PRACTICE AND PROCEDURE 121(b). The moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences are viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The opposing party cannot rest upon mere allegations or denials, but must set forth specific facts showing there is a genuine issue for trial. Rule 121(d).

Lubart argues that IBM's intent is a question of fact and that the aspects of the agreement noted by the Tax Court do not prove

5

IBM intended these payments solely as severance pay. Lubart does not meet his burden of providing specific facts showing there is a genuine issue of fact for trial, however. Lubart is correct that the factors considered by the Tax Court do not conclusively demonstrate that IBM intended the payment as severance pay in the face of evidence to the contrary. For evidence to the contrary, however, Lubart provides only the irrelevant evidence of his subsequent depression and his unsubstantiated allegations that IBM forced him to sign the agreement. These allegations do not contradict the obvious conclusion from the language of the agreement, the nature of the program, and the calculation of the payment itself, that IBM intended the payment as compensation of wages lost upon early retirement and not to settle personal injury claims.

Lubart's case presents no novel issues. In *Webb v. CIR*, 71 T.C.M. (CCH) 2004 (1996), the Tax Court considered almost identical facts: A taxpayer who retired early under the IBM ITO program, suffered mental anguish after the resignation, and then claimed for the first time that he signed the release under protest. The court characterized the payment as severance, noting that under the taxpayer's description of the facts, "the Release itself was the cause of the injury." *Id.* The court also cited the factors considered by the court below in this case. Lubart's claim suffers the same defects. Like the plaintiff in *Webb*, Lubart essentially

6

argues that he has an ADEA or emotional distress claim based on the fact that IBM forced him to resign and sign the release.[2]  Because the wrongful act leading to his subsequent depression did not occur prior to the signing of the release, the simultaneous special incentive payment could not have been made to resolve an existing claim for personal injury.

Favorable tax treatment has even been denied in the Second Circuit when part of a severance payment was expressly conditioned upon the release of claims.  Under Lubart's argument, the mere fact that IBM foresaw lawsuits arising out of the ITO II program meant that the payment was in part a settlement of those potential future claims.  This argument is contradicted by the result in *Taggi v. United States*, 35 F.3d 93, 96-97 (2d Cir. 1994).  In that case, the taxpayer took early retirement under an AT&T program that offered two incentive payment options.  Under one, the taxpayer would have received three percent of his base pay multiplied by the number of years he had worked at AT&T.  Under the second, he would receive five percent.  In order to receive the higher payment, he had to sign a Separation Agreement and Release, which claimed to be a "full legal release."  *Id*. at 94.  After he resigned, he attempted

---

[2] The Supreme Court has held that damages under the ADEA are not excludable under § 104(a)(2) because they compensate lost wages and impose punitive damages, but do not contain an emotional distress or other personal injury component. *Commissioner v. Schleier*, 515 U.S. 323, 326 (1995).  Accordingly, Lubart's payment could only be excluded to the extent it settled a potential state law emotional distress claim.  Because Lubart would have had difficulty proving the kind of outrageous conduct required by Texas law, it is especially unlikely that the special incentive payment was intended to settle such a claim.

to bring a claim under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (the "ADEA"). When this claim was dismissed because of the Separation Agreement, the taxpayer made a refund claim asking that the incentive payment be treated as a payment for personal injury under Section 104(a)(2).

Although Taggi's claim was much stronger than Lubart's, the Second Circuit denied section 104(a)(2) treatment. *Id*. at 96-97. It cited Treasury Regulation § 1.104-1(c), which provides that damages received on account of personal injuries or sickness are those received "through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." 26 C.F.R. § 1.104-1(c). The court noted that exclusions from income are to be defined narrowly and that parties must be prohibited from creating contrived "settlement agreements" to avoid taxation of the proceeds. In order to prevent such contrived settlements, the courts must require the presence of an actual dispute. If section 104(a)(2) were construed to encompass releases of potential unspecified future claims, as Lubart recommends, manufacturing section 104(a)(2) tax treatment would be simple.

While the parameters for section 104(a)(2) treatment remain somewhat undefined, Lubart's case obviously does not fit within them. Because Lubart has alleged no facts to contradict IBM's obvious intent to provide severance pay, the decision of the Tax

8

Court is AFFIRMED.