*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0099P (6th Cir.)
File Name:  00a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DANIEL C. GREER,
     *Plaintiff-Appellee,*

     *v.*
                  No. 98-6593

UNITED STATES OF AMERICA,
     *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 96-00117—Henry R. Wilhoit, Jr., Chief District Judge.

Argued:  August 6, 1999

Decided and Filed:  March 22, 2000

Before:  JONES, SILER, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Kenneth W. Rosenberg, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellant. Patrick F. Nash, Lexington, Kentucky, for Appellee.  **ON BRIEF:**  Kenneth W. Rosenberg, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellant.  Patrick F. Nash, Lexington, Kentucky, for Appellee.

1

———————————

## OPINION

———————————

NATHANIEL R. JONES, Circuit Judge. The United States appeals the district court's grant of summary judgment in favor of plaintiff-appellee Daniel C. Greer ("Greer") in his suit to recover monies that were withheld from him for tax purposes when he was terminated by his employer. For the reasons that follow, we **REVERSE** and **REMAND** for proceedings consistent with this opinion.

I.

Greer worked for Ashland Oil, Inc. ("AOI") from 1969 until his termination in July 1993. During his years of employment with AOI, Greer held a variety of positions, including executive assistant to the executive vice president and executive assistant to the president. In 1988, he served as AOI's environmental compliance director. Although Greer regularly received positive performance reviews during his twenty-four years at AOI, he was fired in July 1993.

Greer and AOI dispute the company's motivations for his firing. According to Greer, the circumstances of his firing were highly suspicious. As environmental compliance director, Greer was required to perform environmental compliance audits of AOI's petroleum operations. Greer held this position for two- and one-half years, and he visited and audited approximately 120 sites. Greer claims he uncovered and documented violations of environmental regulations at AOI refineries. According to Greer, AOI executives feared that his reports might be released to enforcement authorities at a time when AOI was already under their close scrutiny.

In 1991, AOI removed Greer from the environmental compliance department and appointed him director of cost management. Despite the fact that he had no computer programming experience, Greer was assigned the task of creating a complex computer program. After Greer

completed the project, he was given little to do for several months. Eventually, AOI's human resources department informed Greer that his position was being eliminated. Even though Greer claims to have "begged to do anything else in the company," he was dismissed and told that he simply "didn't fit in."[1] Greer appealed his dismissal all the way to AOI's chairman of the board.

Given the events leading to his abrupt termination, Greer believes AOI terminated him because he had too thoroughly identified and documented AOI violations of environmental regulations. When Greer learned that his termination was final, he told AOI representatives, "I will seek whatever remedies are available to me to protect myself in whatever way I can." However, Greer never explicitly threatened AOI with a wrongful termination lawsuit, nor did he sue AOI. In fact, Greer admitted in his deposition that he "didn't have the foggiest idea" what his legal rights were at that time.

Shortly after notifying Greer of his impending termination, AOI proposed a compensation package to Greer. After consulting with his attorney, Greer signed the proposed agreement on his last day at AOI. AOI's normal severance policy was to grant one week's salary for each year of service. In Greer's case, a normal severance package would have totaled $51,000. However, AOI and Greer agreed that AOI would pay Greer $331,968 in exchange for Greer's surrendering all claims against AOI. Specifically, by accepting the offered compensation, Greer signed a document titled "Severance Agreement and Release" ("the agreement") which waived:

> any and all claims, rights, and causes of action [against AOI] of all nature, which may have arisen, or which may arise, known or unknown, out of any events or actions occurring before the date of his execution of this release, including, but not limited to, his employment, *the*

---

[1] AOI officials claim that Greer never requested a transfer to another position after his position was eliminated.

*termination of his employment*, or any prior agreements between the parties, and expressly including, without limitation, as claims to be released, *any claims of wrongful discharge*, or any claims related to acts or omissions of the Company involving him, or of discrimination under any federal, state or local law, rule or regulation. Examples of such federal, state or local law, rule or regulation regarding discrimination include, but are not limited to, any claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, or any claims arising under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* This release is for any relief, no matter how denominated, including but not limited to wages, back pay, front pay, compensatory damages, or punitive damages.

J.A. at 116 (emphasis added). In his deposition, Randy Lohoff ("Lohoff"), AOI's vice president of human resources, testified that it is AOI policy to include this general waiver whenever it grants an employee an increase in the normal severance pay.

AOI's standard practice is to withhold taxes from every settlement amount it pays. The company applied that policy to Greer's case and withheld $108,873 from the compensation package for federal income tax purposes. On June 25, 1996, Greer filed for a refund in the district court pursuant to 26 U.S.C. § 104(a)(2), seeking to recover the amount of his compensation package that was withheld for taxes.

After depositions were taken of Greer and Lohoff, both the Government and Greer filed motions for summary judgment. Greer argued that the funds he received from AOI constituted the settlement of his potential wrongful discharge claim. He asserted that the circumstances of his termination diminished his personal and professional reputation, and inflicted stress, humiliation, mental anguish, self doubt and emotional pain. Because they were part of the settlement of this potential claim, Greer argued, the funds he received under the agreement could not be taxed. The Government countered

that punitive damages are not "on account" of personal injuries or sickness); *Burke*, 504 U.S. at 238-39 (holding that remedies such as backpay and frontpay are not excludible).

For this reason, although we agree that the payment was made in lieu of Greer's tort claim, we believe the district court acted too hastily when it granted summary judgment in Greer's favor. Because a crucial issue remains in dispute, a trial may be necessary. Greer faces the burden of showing the court either that AOI made the entire "bonus" payment on account of his personal injuries, or presenting evidence which would allow the court to determine that a distinct portion of the payment was made on account of personal injuries.

IV.

We find that the district court correctly concluded that the $280,968 payment above and beyond AOI's standard $51,000 severance payment was in lieu of Greer's tort claim. At the same time, a genuine issue remains as to whether that payment was made "on account" of personal injuries. For this reason, we believe the district court must determine if the payment was indeed "on account" of Greer's claimed personal injuries, making the amount paid excludible under the Code. Pursuant to III.D.1.c of this opinion, the district court may apportion between the excludible and non-excludible amounts of the payment if the evidence allows for such a fine-tuned determination. We therefore **REVERSE** the district court's holding, and **REMAND** for proceedings consistent with this opinion.

d.

In sum, we find the following factual showings made by Greer to be undisputed: Greer had a bona fide tort-based claim against AOI for wrongful discharge; the claim existed at the time the agreement was reached; and the claim encompassed personal injury. Other undisputed facts—primarily the exorbitant amount paid to Greer relative to a standard AOI severance package and the evidentiary showing that AOI officials were aware of Greer's potential claim—establish that the agreement constituted a settlement in lieu of prosecution of that claim.

2.

Despite the strength of his evidence that the payment was made in lieu of his tort claim, Greer has failed to surpass the second factual hurdle to gain exclusion under § 104(a)(2)—that the payment was "on account of personal injuries or sickness." *Schleier*, 515 U.S. at 330. As stated *supra*, there is no doubt that Greer's tort claim may have encompassed personal injuries. "Personal injuries" include nonphysical injuries, "such as those affecting emotions, reputation, or character," *Burke*, 504 U.S. at 235 n.6, and can include "intangible as well as tangible harms." *Schleier,* 515 U.S. at 329 & n.4. Emotional distress, mental pain and suffering, and injury to personal and professional reputation also constitute personal injuries for exclusion purposes. *See supra.* These are precisely the types of injury that Greer now claims his wrongful discharge rendered: damage to his personal and professional reputation, as well as distress, humiliation, and mental anguish. However, Greer has not presented concrete evidence demonstrating the precise causal connection between such personal injuries and AOI's payment to him, a showing *Schleier* requires before a court can render a settlement payment excludible. For example, AOI may have intended portions of the payment to have been on account of lost wages, lost future earnings, or punitive damages, none of which are excludible under § 104(a)(2). *See O'Gilvie v. United States,* 519 U.S. 79, 83 (1996) (stating

that the extra compensation from the agreement covered both the release of all potential claims as well as consideration of his past service. Because the funds paid to Greer comprised non-excludible compensation, the full amount could be taxed.

On September 22, 1998, the district court filed an unpublished opinion granting Greer's motion for summary judgment and denying the Government's motion. The district court determined that the compensation package constituted a nontaxable personal injury tort settlement. Specifically, the district court concluded that $280,968 was nontaxable and that approximately $51,000 of the agreement constituted normal severance pay that could be taxed as income.

The Government filed this timely appeal. Greer does not contest the finding that $51,000 was taxable income.

II.

This court will review a grant of summary judgment *de novo. See Terry Barr Sales Agency, Inc. v. All-Lock Co.,* 96 F.3d 174, 178 (6th Cir. 1996). Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. *See id.* (citing Fed. R. Civ. P. 56(c)). Although both parties below stipulated that there were no disputes over any material facts in the case, and each submitted motions for summary judgment, that fact "does not require [us] to rule that no fact issue exists." *Cherokee Insurance Co. v. E.W. Blanch Co.*, 66 F.3d 117, 123 n.4 (6th Cir. 1995) (quoting *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948)). Indeed, "summary judgment in favor of either party is not proper if disputes remain as to material facts." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). At the same time, "cross motions for summary judgment do authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981).

### III.

Under § 61(a) of the Internal Revenue Code taxpayers are liable for all gross income, meaning "all income from whatever source derived . . . ." 26 U.S.C. § 61(a) (1994). As the Supreme Court has oft repeated, this section is to be construed liberally "in recognition of the intention of Congress to tax all gains except those specifically exempted." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955). Thus, there is no dispute that the compensation paid to Greer under the agreement falls well within the broad sweep of § 61(a) unless it is specifically excluded elsewhere in the Code. *See Commissioner v. Schleier*, 515 U.S. 323, 328 (1995) (concluding that the taxpayer's settlement agreement "constitutes gross income unless it is expressly excepted by another provision"); *United States v. Burke*, 504 U.S. 229, 233 (1992) ("There is no dispute that the settlement awards in this case would constitute gross income within the reach of § 61(a)."). Exclusions to § 61(a) are narrowly construed, *see Schleier*, 515 U.S. at 328; *Commissioner v. Jacobson*, 336 U.S. 28, 49 (1949), and the taxpayer bears the burden of proving the amount he is entitled to recover. *See United States v. Janis*, 428 U.S. 433, 440 (1976).

Greer claims that most of the compensation at issue should be excluded because it falls within § 104(a)(2) of the Code, which excludes from gross income any "damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." 26 U.S.C. § 104(a)(2). The Supreme Court in *Schleier* set forth a two-prong test that must be met for compensation to fall within § 104(a): exclusion is warranted only when an amount is received (1) through the prosecution of an action or the settlement entered into in lieu of prosecution of an action based upon tort or tort-type rights; and (2) the amount is paid on account of personal injuries or sickness. *See* 515 U.S. at 337; *Gerbec v. United States*, 164

---

AOI was aware of the potential for such a claim. This clear evidence distinguishes this case from *Pipitone* and *Taggi* and renders the lower court's apportionment of the payment proper.

Finally, to the extent that *Taggi* and *Pipitone* stand for the proposition that courts can never engage in apportionment—a stance the Government takes—we disagree with that conclusion. Such a hard-and-fast rule not only stands on weak legal ground,[6] but would defy the established framework of scrutinizing the totality of the circumstances to determine the intent of the payor whenever a written severence/settlement agreement is not clear as to its purpose. If in undertaking this inquiry, a court finds the evidence to be sufficiently clear that it can determine that a specific amount was paid for settlement purposes under *Schleier*, we see no reason why a court should not set that amount aside as excludible. Indeed, we believe this is what the relevant precedent requires. Of course, outside of an explicit apportionment, evidence will rarely be clear enough to allow for such a determination. Nonetheless, we find this to be that rare case where it is.

---

[6] *Taggi* cited a 1985 Minnesota district court decision in support of its statement that the court "was not in a position to apportion the payment among the various possible claims." 35 F.3d at 96 (quoting *Villaume v. United States,* 616 F. Supp. 185, 190 (D. Minn, 1985)), and also cited several Tax Court cases. *See, e.g.*, *Whitehead v. Commissioner,* 49 T.C.M. (P.H.) ¶ 80,508 (1980). These cases all look back to a 1979 Tax Court decision, *Gunderson v. Commissioner.*, 48 T.C.M. (P.H.) ¶ 79,099 (1979). But *Gunderson* never enunciated a rule against non-apportionment. Instead, the *Gunderson* Court only held that based on the facts of the case before it, there was no evidence that the payor intended the lump sum payment to the employee to be anything but to settle contractually based rights. *See Gunderson,* 1979 T.C.M. (P.H.), at 79-435 ("[T]here is [no] factual basis in the record upon which we could make an allocation of the settlement to any specific claims that petitioner might have asserted against [his employer]."). Thus, it appears that later cases such as *Whitehead* converted *Gunderson*'s fact-based conclusion into an ironclad rule of law, and cases like *Taggi* propounded *Whitehead*'s mistake. Moreover, none of these "non-apportionment" decisions articulated any reason for such a rigid non-apportionment rule.

I guess I'd have to refer to the agreement itself and it would -- it's provided because of the promises made and accepted between Mr. Greer and Ashland as stated in the severance agreement and release as to why the payments were made . . . . I think the document speaks for itself.

J.A. at 105.

In short, although Lohoff's testimony creates an issue of fact as to whether *he personally* knew of the full set of circumstances regarding Greer's termination, his testimony does nothing to counter Greer's showing that other AOI officials—and most critically, Thomas—were aware of the background circumstances leading to Greer's ultimate termination. Because cross motions for summary judgment allow a reviewing court to assume that there is no additional evidence to be considered, we find that there is no issue of fact regarding Greer's showing that AOI was aware of his tort claim.

c.

Finally, we believe the facts of this case are sufficiently unique and the evidence sufficiently clear to allow the district court to apportion the payment into the components that were "in lieu" of a tort claim and those that were clearly not. Unlike *Taggi* and *Pipitone*, where the evidence was not adequate to enable those courts to apportion among various claims, *see Pipitone*, 180 F.3d at 165; *Taggi*, 35 F.3d at 96, the undisputed evidence in this case allows for such a determination.   First, it is clear that AOI's standard calculation would have provided Greer with a severance payment of $51,000, an amount that is not excludible. Second, Greer has adduced that there were no other viable claims at the time of the agreement.   Under cross-examination, Lohoff acknowledged that AOI officials perceived Greer to have no viable claims against AOI for age discrimination or Title VII discrimination, which were the only other specific claims waived by the agreement. The record thus leaves wrongful discharge as the only bona fide claim at the time of the agreement, and, crucially, evinces that

F.3d 1015, 1025 (6th Cir. 1999) (citing *Schleier*).[2]  This two-part test tightly packs a number of discrete elements.  Due to the complexity of this case, we find it useful to disaggregate the test into its disparate elements. To satisfy *Schleier*, the taxpayer must show that 1) there was an underlying claim sounding in tort; (2) the claim existed at the time of the settlement; (3) the claim encompassed personal injuries; and (4) the agreement was executed "in lieu" of the prosecution of the tort claim and "on account of" the personal injury, rendering it a settlement rather than a mere severance agreement.  By requiring each of these elements, courts can effectively distinguish between severance and settlement agreements and prevent parties from "creating contrived 'settlement agreements' to avoid taxation of [severance] proceeds." *Lubart v. Commissioner*, 154 F.3d 539, 542 (5th Cir. 1998).

The Government argues that the agreement between Greer and AOI lacks several of these elements and thus constitutes a fully taxable severance package under § 61(a). We disagree, concluding that the agreement and the unique circumstances leading to its inception satisfy most of these elements; indeed, we find that the agreement meets the first prong of the *Schleier* test—that it was made in lieu of a viable, existent tort claim.  At the same time, we believe a genuine issue remains as to what amount of the payment, if any, was "on account of" personal injuries.

A.

The compensation AOI paid to Greer satisfies the first element we listed *supra*: that the alleged claim be based upon tort or tort-type rights. *See Schleier*, 515 U.S. at 337. To make this determination, we must "focus[] on the origin and

---

[2]This test emanated in part from treasury regulations that had defined the term "damages received" as "an amount received . . . through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Treas. Reg. § 1.104-1(c).

characteristics of the claims settled in determining whether such damages are excludible under § 104(a)(2)." *Pipitone v. United States*, 180 F.3d 859, 862 (7th Cir. 1999) (citing *Burke*, 504 U.S. at 237). In particular, we look to state law to determine the nature of the claim. *See Burnet v. Harmel*, 287 U.S. 103, 110 (1932) ("[S]tate law creates legal interests, but the federal statute determines when and how they shall be taxed."). In this case, Greer alleges that his underlying claim was wrongful discharge, which is a clearly recognized tort claim under Kentucky law. *See Firestone Textile Co. Div. v. Meadows,* 666 S.W.2d 730, 733 (Ky. 1983). The Government does not dispute that wrongful discharge is a tort that could give rise to § 104(a)(2) exclusion.

## B.

Second, we conclude that the wrongful discharge claim existed at the time Greer and AOI struck the agreement. As other courts have stated, for an agreement to be rendered a settlement, there must be an actual dispute and existing claim at the time of that agreement. *See Pipitone*, 180 F.3d at 862; *Lubart*,154 F.3d at 542. Claims for potential future personal injuries are insufficient. *See Pipitone,* 180 F.3d at 862; *Lubart*, 154 F.3d at 542 ("If section 104(a)(2) were construed to encompass releases of potential unspecified future claims, . . . manufacturing section 104(a)(2) tax treatment would be simple."). The dispute must be bona fide, although it need not be valid or sustainable. *See Pipitone,* 180 F.3d at 862.

We find that a bona fide claim for wrongful discharge under Kentucky law existed at the time of the settlement. Kentucky law recognizes a cause of action for wrongful discharge "based on public policy." *Firestone Textile Co. Div.*, 666 S.W.2d at 732. Such a public policy-based wrongful discharge claim exists when the "alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment," or when the reason for the discharge "was the employee's exercise of a right conferred by well-established legislative enactment." *Nelson Steel Corp. v. McDaniel*, 898 S.W.2d 66, 69 (Ky.

that Lohoff concluded that he had not been aware of any claims on the horizon. *See* J.A. at 99-101 (stating that he "didn't recall him ever making that type of statement," and that he "didn't recall [Greer] making any statements" that AOI had violated environmental regulations "to me").

But as both Greer and Lohoff testified, Greer expressed his displeasure directly with other, more senior AOI officials. First, Greer testified and Lohoff acknowledged that he had a closed-door meeting with the chairman of AOI, John Hall, about his termination. Second, Greer discussed these matters on numerous occasions with Richard Thomas, who during the period in question was vice president of human resources, vice president of the law department, general counsel for the petroleum company, and responsible for all environmental activities in the company. Thomas was not only the person to whom Greer had directly reported when he was responsible for environmental compliance, but he "reviewed" with Thomas the controversial findings he had made in that position. Thomas was also the official who personally informed Greer of his termination. According to Greer, Thomas—who was Lohoff's boss at the time—was also a point-man in the negotiations that culminated in the agreement, and Greer directly told Thomas that he would "have to seek whatever remedies are available to me," J.A. at 37. Overall, therefore, given his broader role in the company and long-time supervision of and interaction with Greer, Thomas was the key AOI official who, according to Greer's testimony, knew of the environmental violations and also was directly involved in hammering out the settlement agreement. Yet nowhere in the record has the Government attempted to rebut this evidence regarding Thomas's involvement and knowledge. Thomas was not himself deposed, and the Government asked Lohoff nothing about Thomas's or other officials' perceptions of Greer's potential claim. Only once was Lohoff directly asked whether, "[a]s far as *Ashland* was concerned," the payment was of the nature of severance pay or a settlement. J.A. at 105 (emphasis added). Rather than countering Greer's account, his answer was nonresponsive:

that AOI officials had good reason to know that a bona fide wrongful discharge claim existed at the point of Greer's termination.  Moreover, Lohoff, the Government's only witness, largely bolstered Greer's account of events.  First, he confirmed the basic career progression that Greer had described.  Second, Lohoff testified that he knew that Greer was not pleased with his dismissal, and that he was sufficiently disgruntled to appeal it through several levels of management.  His testimony, coupled with the agreement itself, also showed that the agreement took Greer's individual needs into account.  Lohoff acknowledged, for instance, that AOI adjusted the agreement after Greer indicated he felt that Ashland may have "somehow wronged him" regarding certain investment losses.  J.A. at 100-01; J.A. at 118.  *See also* J.A. at 109 (acknowledging that "there are provisions in it that . . . are specific to Mr. Greer").

Most importantly, Lohoff's testimony failed to rebut Greer's assertions that AOI had reason to know of his bona fide wrongful discharge claim.  This is because most of Lohoff's statements simply described his own personal conversations with Greer and his impressions based on those conversations, which were of limited value to the Government in light of both Greer's and Lohoff's testimony that a number of the crucial conversations in question did not involve Lohoff at all.  In fact, relative to other persons with whom Greer interacted at AOI, Lohoff was in a poor position to know of Greer's potential claims against the company.  Lohoff himself acknowledged that Greer and he did not interact much at AOI.  He further testified that he was aware of other conversations Greer had had regarding his termination, the details of which he was not knowledgeable.  J.A. at 98-99 (acknowledging that Greer "appealed [his] dismissal beyond [him]" and that he "was not privy to those conversations"); J.A. at 99 (stating that Greer "had discussions with other people as well, including the Chairman of the Board").  Nevertheless, the sole evidence the Government elicited comprised Lohoff's narrow testimony about what Greer had told him personally in their limited interaction, and it was based only on this limited interaction

1995) (internal quotation marks and citation omitted).  Whether or not Greer could have prevailed on such a wrongful discharge claim in state court is irrelevant here.  Rather, we find that Greer's account of the unique circumstances of his firing—an account which, as we explain *infra*, the Government largely failed to dispute—was sufficient to state a bona fide claim for wrongful discharge at the time of his termination.

The Government wrongfully asserts that a claim could not have existed unless Greer actually filed that claim against AOI before the settlement.  Circuit courts and the Tax Court have consistently rejected such a formalistic requirement.  *See, e.g.*, *Pipitone*, 180 F.3d at 863 ("The fact that Pipitone did not file a formal suit alleging these claims . . . is not necessarily detrimental to his efforts to establish the existence of an underlying cause of action."); *Carey v. Commissioner*, 74 T.C.M. (CCH) 705, 707 (1997) (stating that the claim "need not have been previously asserted"); *Phillips v. Commissioner*, 74 T.C.M. (CCH) 187, 190 (1997); *Keel v. Commissioner*, 73 T.C.M.(CCH) 3092, 3095 (1997); *see also Hamm v. Commissioner*, 74 T.C.M. (CCH) 279, 282 (1997) ("[W]e have not found . . . any authority for the proposition that the taxpayer must file a claim prior to the settlement agreement in order . . . to qualify for the exclusion.").  We also find that the Government mischaracterizes the Second Circuit's holding in *Taggi* when it suggests that that opinion required that a claim actually be made.  *See* Gov't Br. at 21-23, 26 (reading *Taggi* to say that "if the taxpayer has not asserted a claim, there is nothing to settle").  In fact, consistent with other courts, the *Taggi* Court considered Taggi's failure to make a formal claim as but one factor of a multi-factor analysis.  *See* 35 F.3d at 96.  Directly after observing that no claim had been filed, the court proceeded to consider the contents of the agreement, the amount paid to Taggi, and the consequences of the signing of the agreement (namely, no subsequent litigation).  *See id*.  Had the court used a strict filing requirement as the Government suggests, the latter analysis would have been wholly unnecessary.  *See generally Hamm*, 74 T.C.M. (CCH) at 282 (reading *Taggi*

similarly). Thus, we conclude that Greer's failure to file suit against AOI does not defeat his argument that a bona fide claim existed.

## C.

Third, we find that Greer's tort claim potentially involved injuries that were personal. Courts and the IRS have long recognized that §104(a)(2)'s reference to personal injuries "encompasses . . . nonphysical injuries to the individual, such as those affecting emotions, reputation, or character . . . ." *Burke*, 504 U.S. at 235 n.6. *See also Schleier,* 515 U.S. at 329 & n.4 (stating that § 104(a)(2) covers "intangible as well as tangible harms"). Specifically, personal injuries include emotional distress, *see Burke*, 504 U.S. at 235 n.6, mental pain and suffering, *see Bent v. Commissioner*, 835 F.2d 67, 70 (3d Cir. 1987), and injury to personal and professional reputation. *See Threlkedl v. Commissioner,* 848 F.2d 81, 83-84 (6th Cir. 1988); *Church v. Commissioner*, 80 T.C. 1104, 1109 (1983). Here, Greer's tort claim sufficiently encompasses personal injury. Specifically, Greer claims injuries to his personal and professional reputation, as well as distress, humiliation, and mental anguish. These claims of non-physical injury fall within the broad ambit of § 104(a)(2) "personal" injuries.[3]

## D.

Fourth, and most critically, we must determine the motivation behind the agreement itself. In determining whether it was reached "in lieu" of the tort claim in existence at the time and "on account of" the personal injuries underlying that claim, 26 U.S.C. § 104(a)(2), we consider all facts and circumstances. *See Kroposki v. Commissioner*, 74 T.C.M. (CCH) 1434, 1436 (1997). We first look to the

---

[3]In 1996, Congress amended § 104(a)(2) to read "on account of personal *physical* injuries or *physical* sickness." (emphasis added). Because the amendment took effect after AOI and Greer executed their agreement, it is not applicable to this case.

First, this case stands out among most of this type, which often involve conclusory allegations of claims and employer's knowledge of claims—allegations that courts have properly found unavailing. *See, e.g.*, *Lubart*, 154 F.3d at 542 (rejecting taxpayer for only alleging "potential unspecified future claims"); *Kroposki*, 74 T.C.M. (CCH) at 1435 (rejecting taxpayer's allegations as after-the-fact, self-serving, and uncorroborated); *Keel*, 73 T.C.M. (CCH) at 3095 (opining that "we are furnished with no clue as to the nature of the claimed injuries"). In contrast, Greer presented substantial evidence suggesting not only that the tort claim based on personal injury existed, but that AOI had good reason to know of the potential wrongful discharge claim. This evidence went largely undisputed by the Government. Greer testified that he was transferred from his position as environmental compliance director shortly after issuing a series of "embarass[ing]" reports documenting various environmental regulation violations by AOI. J.A. at 62. The new position was one for which he was ill-qualified technically, and after some time, the post demanded little responsibility from Greer for the $100,000-plus salary it paid him. Finally, on short notice and with little explanation, AOI terminated him. Moreover, unlike the numerous cases where there is no evidence that taxpayers had "even talked to" the employer about a possible tort suit, *Morabito v. Commissioner*, 74 T.C.M. (CCH) 62, 64 (1997), Greer presented such evidence below. First, he appealed his dismissal all the way to the chairman of the company. Second, he specifically warned AOI officials that he would "seek whatever remedies [w]ere available to [him]," and indicated that he would "protect [him]self in whatever way [he] could." J.A. at 74, 79.[5]

Based on Greer's testimony as to his employment history and his dialogue with his AOI supervisors, the record shows

---

[5]Because it is the intent of the *payor* that matters, the Government errs when it argues that Greer did not know that he enjoyed a wrongful discharge claim in particular. Gov't Br. at 23. The crucial question is whether AOI officials interpreted Greer's threatening statements to mean that they potentially faced a wrongful discharge suit.

Greer dwarfed the amount that would have resulted using AOI's standard calculation of severance pay—one week of salary paid for each year of service. Based on Greer's length of service—twenty-four years—and his salary at the time—$112,000 per year—a standard severance payment would have been approximately $51,000. AOI paid him just under $332,000—well over six times the standard amount. Although AOI acknowledged that it generally provides more compensation than standard severance when a terminated employee releases claims, neither AOI nor the Government provided any explanation for the dramatic increase in Greer's "bonus." Lohoff's only explanation was that "[i]t ha[d] to do with some relationship to a salary." J.A. at 103. Nor have we found any other cases where the release "bonus" approximated such a dramatic increase. In *Taggi*, for example, AT&T supplemented the standard severance payment owed to Taggi, $29,700, with an additional $19,800 for the general release. *See* 35 F.3d at 96. In *Pipitone*, the employer provided Pipitone with twice the number of months owed under the severance policy, which was the standard bonus paid for such releases. *See* 180 F.3d at 865. Thus, unlike other cases finding agreements to be for severance purposes only, we can not conclude that the payment made to Greer was either standard for AOI or based on a standard severance calculation. To the contrary, it was far in excess of such a calculation, as well as far in excess of AOI's standard severance agreement.

b.

Second, courts look to other evidence to divine the payor's intent in executing the agreement, including the circumstances leading to the termination, the filing of a claim against the employer prior to the agreement, and other statements by and events involving the parties. While "the absence of any knowledge of the claim on the part of the employer-payor obviously has a negative impact in determining the requisite intent of the payment," *Keel*, 73 T.C.M. (CCH) at 3095, we find the record to support Greer's assertion that AOI had knowledge of his potential claim.

agreement itself for indicia of its purpose. If the agreement lacks express language of purpose, we look beyond the agreement to other evidence that may shed light on "the intent of the payor as to the purpose in making the payment." *Knuckles v. Commissioner*, 349 F.2d 610, 613 (10th Cir. 1965); *see also Lubart*, 154 F.3d at 541 ("[T]he intent of the employer [] determine[s] the treatment of the payment."). This includes considering the amount paid, comparing the circumstances and amount paid to other agreements the company has entered into, considering the factual circumstances that led to the agreement, and weighing other facts that may reveal the employer's intent. *See generally Pipitone*, 180 F.3d at 864-65. We also heed the wisdom that "[w]hen assessing the tax implications of a settlement agreement, courts should neither engage in speculation nor blind themselves to a settlement's realities." *Bagley v. Commissioner*, 121 F.3d 393, 395 (8th Cir. 1997). Applying this fact-based analysis, we find that the unique circumstances of Greer's termination rendered the agreement a settlement reached "in lieu" of the existent tort claim.[4] Nonetheless, we find that there remains a dispute as to whether the agreement was "on account of" personal injuries. The case must be remanded for this factual determination.

1.

First, we conclude that there is no genuine issue as to whether AOI provided the payment in lieu of Greer's existent

---

[4]In doing so, we find that the material facts on this issue are not in dispute. The agreement itself is clear, and there is no dispute over the amount paid. Greer's description of his job history at AOI was largely undisputed by Lohoff. Most importantly, the presence of a bona fide, if not necessarily valid, tort claim is also not in dispute; neither is AOI officials' knowledge of the potential for such a claim. For reasons stated below, given Greer's description of the events culminating in his termination, Lohoff—the only witness the Government deposed—was only minimally effective in countering Greer's account. Therefore, even viewing the evidence in the record in a light most favorable to the Government, there is no dispute over the material facts on this issue.

tort claim. The government wholly failed to rebut Greer's evidence that this was in fact the case.

First, like most agreements in cases such as this, the agreement does not resolve whether it is a settlement or a severance agreement. On its face, the agreement does not appear to be drafted with a specific tort in mind. Courts generally find the fact that a waiver is broadly worded to support a finding that the settlement does not come within the § 104 exclusion. *See, e.g.*, *Pipitone,* 180 F.3d at 864 (noting that the agreement "is a general release of all claims and makes no specific reference to whether the payment compensated Pipitone for personal injuries or sickness"); *Ball v. Commissioner,* 163 F.3d 308, 309 (5th Cir. 1998) (concluding that an agreement releasing a "laundry list" of possible claims is not a settlement for "personal injury or sickness" within § 104). The agreement in this case is much like those of *Pipitone* and *Ball*. It waived a variety of claims: wrongful discharge, age discrimination, Title VII, and claims regarding prior agreements between Greer and AOI. Despite the express waiver of the wrongful discharge claim, such a "broad" and "generic" release does not render the payments excludible, *Ball*, 163 F.3d at 309, and bolsters the Government's argument that AOI did not intend the agreement to be a waiver of tort claims. The fact that the agreement provides for the withholding of federal income taxes and that AOI withheld the amount at issue in this case also boosts the Government's case that AOI intended the payment to be for non-tort, severance-type purposes. Nevertheless, that presumption is somewhat diluted because Lohoff testified that AOI would "typically" withhold even in a settlement for a wrongful discharge action. Overall, as in most cases of this type, the agreement itself is not sufficiently explicit to resolve this issue.

We thus are required to look "beyond the words" of the agreement to divine the payor's purpose. *Pipitone*, 180 F.3d at 865. When we do so in this case, we find conclusive evidence that AOI intended this to be a settlement of a wrongful discharge claim. We also note that the facts in the

record are substantially dissimilar from cases where courts found agreements to be for severance purposes only.

a.

First, the amount of compensation Greer received strongly supports his contention that the agreement was a settlement of his tort claim. Generally, other courts have reasoned that the manner in which an agreement calculates payment provides reliable evidence of the nature of an agreement. *See, e.g.*, *Pipitone*, 180 F.3d at 865; *Lubart*, 154 F.3d at 541. Specifically, payments are categorized as standard severance pay when they are calculated based on the length of the terminated employee's service to the employer (with possible bonus allowances for their agreement to sign the waiver) and appear to be consistent with the amount paid to other employees under similar agreements. *See Pipitone*, 180 F.3d at 865; *Lubart*, 154 F.3d at 541; *Kroposki*, 74 T.C.M. (CCH) at 1436. Most agreements at issue in cases such as this have easily complied with these standards, largely because they were reached with numerous employees as part of a general "downsizing." *See, e.g.*, *Lubart*, 154 F.3d at 541 (concluding that Lubart's termination agreement, executed as part of a broad IBM downsizing program, "was a standard document offered to all employees" and its amount was calculated based on salary and years of service); *Taggi*, 35 F.3d at 94 (stating that Taggi's termination was part of a general AT&T workforce reduction); *Carey*, 74 T.C.M. (CCH) at 708 (concluding that the release at issue "was calculated on length of service and salary" and was "essentially the same as that in the many other cases involving IBM separation pay"); *Hamm*, 74 T.C.M. (CCH) at 283 (granting weight to the fact that the employee's termination was part of a broader IBM reduction program implemented to reduce the number of employees and increase company efficiency).

Greer's case is strikingly different. His termination was isolated, as opposed to part of a general reduction. He was told simply that he "didn't fit in" despite years of positive performance reviews. And crucially, the amount AOI paid